Virgil **VAN BIBBER**, The Van Bibber Lakeside Retreat, Inc., and American Fletcher National Bank and Trust Company, Appellant,

v.

William C. **NORRIS**, Appellee.

No. 481S91.

Supreme Court of Indiana.

April 3, 1981.

Terrill D. Albright, James M. Carr, Indianapolis, for American Fletcher National Bank and Trust Company.

Glenn E. Davis, Sr., Beech Grove, for Virgil Van Bibber and The Van Bibber Lakeside Retreat, Inc.

Robert J. Hoffman, Hugh G. Baker, Jr., Steven D. Allen, Indianapolis, for appellee.

ON PETITION TO TRANSFER

DeBRULER, Justice.

This case is before us on a petition to transfer from the Court of Appeals, Fourth District. The opinion of that court is reported at 404 N.E.2d 1365 (Ind.1980); *reh'g den'd* 408 N.E.2d 1302. We grant transfer and vacate the opinion of the Court of Appeals.

Plaintiff-appellee Norris brought this action against defendants-appellants Virgil Van Bibber, Van Bibber Lakeside Retreat, Inc., and American Fletcher National Bank for damages for the wrongful repossession of his mobile home and the loss of its contents. The trial court awarded damages of $5,000 for the home and $10,000 for the contents against all of the defendants, giving the Van Bibber defendants a setoff of $1,837.41 for their claims against Norris.

In addition, the trial court assessed punitive damages of $10,000 against American Fletcher National Bank (AFNB) and $30,000 in punitive damages jointly and severally against Virgil Van Bibber and Van Bibber Lakeside Retreat, Inc., (referred to collectively as Van Bibber). The Court of Appeals affirmed.

AFNB and Van Bibber separately appealed the decision, but because the issues raised by the separate appellants are interrelated we will treat them together.

We adopt the Court of Appeals' statement of the facts:

"Norris purchased a mobile home from Van Bibber in 1965. The total time balance of this purchase was $5,738.04. This amount included the finance charge and insurance expenses. Norris agreed to pay the balance in 84 monthly instalments of $68.31. These fell due on the thirtieth day of each month. The contract between Van Bibber and Norris was on a form prepared by the bank. It was entitled 'retail instalment sale security agreement.' Van Bibber assigned the contract to the bank on a full repurchase basis.

"The contract contained the following provision:

'Upon the occurrence of any of the following events or conditions, namely: (i) default in the payment or performance of any of the obligations of the Buyer or of any covenant or liability contained or referred to herein; (ii) any warranty, representation or statement made or furnished to the Seller by or on behalf of the Buyer in connection with this Agreement proving to have been false in any material respect when made or furnished; (iii) loss, theft, substantial damage, destruction, sale or encumbrance to or of any of the Goods, or the making of any levy, seizure or attachment thereof or thereon; (iv) death, dissolution, termination of existence, insolvency, business failure, appointment of a receiver of any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding under, any bankruptcy or insolvency laws by or against the Buyer or any guarantor or surety for the Buyer; or (v) the Seller, for any reason deeming itself insecure, the Seller may at its option without notice or demand declare all of the Buyer's obligations to be immediately due and payable and shall then have the remedies of a secured party

under the Uniform Commercial Code as enacted in Indiana (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted), including without limitation thereof, the right to take possession of the Goods, and for that purpose the Seller may, so far as the Buyer can give authority therefor, enter upon any premises on which the Goods or any part thereof may be situated and remove the same therefrom. The Seller may require the Buyer to make the goods available to the Seller at a place to be designated by the Seller which is reasonably convenient to both parties. Unless the Goods are perishable or threaten to decline speedily in value or are of a type customarily sold on a recognized market, the Seller shall give the Buyer at least ten (10) days' prior written notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. Expenses of retaking, holding, preparing for sale, selling or the like shall include the Seller's reasonable attorney's fees and legal expenses.'

"The repurchase obligation of VanBibber was contained in the following language:

'This assignment is made:

'. . .

'4) on a FULL REPURCHASE basis whereby Dealer agrees to purchase the Goods from the Bank for the unpaid balance due under the terms of the Agreement if the Goods are repossessed by the Bank and offered to the Dealer within 90 days after maturity of the earliest instalment remaining unpaid, or if the Bank is required by law or by the order of any court or governmental agency to hold said Goods for any reason, the Dealer will accept delivery of the Goods as soon as they can be delivered, notwithstanding the fact that delivery may be delayed for such reason beyond the 90-day period mentioned above, and the Dealer will so

purchase the Goods although the Bank has, prior thereto, and without Dealer's consent waived default by the Buyer in the performance of the Agreement or has granted an extension of time to the Buyer in which to perform, or has taken possession of Goods.'

"Very often Norris was late with his monthly payments. The bank's employee, John Runk, testified that out of fifty-nine payments Norris was past due (five days late) fifty-seven times. Thirty-seven times the account was delinquent (over ten days late). The bank would press him for the payments. Eventually Norris would make them. Sometimes his mother made the payments for him. The bank's brief also informs us that on seventeen occasions instalments were more than thirty days overdue. The bank twice extended the maturity date.

"Norris initially kept the mobile home at a trailer park operated by VanBibber. Animosity developed between Norris and Van Bibber. Norris eventually removed his mobile home from Van Bibber's trailer park. By this time Norris was allegedly indebted to VanBibber for about $400.00. This debt was evidence by a promissory note.

"Upon leaving the Van Bibber trailer park Norris moved his mobile home to a park operated by Imperial Estates. Norris became indebted to Imperial Estates.

"An instalment on the bank loan fell due October 30, 1970. Norris did not pay the instalment by that date. According to Runk's testimony the bank would not consider a payment delinquent until 'over ten days past the payment date.' The tenth day was November 9.

"On November 6, 1970, Imperial Estates filed a 'Complaint for Rent and Restraining Order' against Norris. The purpose of this was to recover delinquent rent and various penalties. Imperial Estates also prayed the court to order Norris not to remove his mobile home from the trailer park. The Montgomery Circuit Court issued the order the same day.

"Norris tried to remove his mobile home secretly from Imperial Estates on the night of November 7–8. His friend Ronnie Van Bibber, the son of defendant VanBibber, assisted him in this attempt. Norris planned to tow the trailer with a truck belonging to defendant Van Bibber. The removal attempt was thwarted when Norris was served with the restraining order.

"November 8 was a Sunday. That evening law officers arrested and incarcerated Norris and Ronnie Van Bibber in Indianapolis on a drug charge. The elder Van Bibber was not immediately aware of this.

"The next morning, November 9, Van Bibber called John Runk of the Bank. VanBibber first asked whether the account of Norris was current. Runk 'advised him that it was at that time.' (This was consistent with his testimony that the bank would not consider the account delinquent until ten days after October 30, and November 9 was the tenth day.) After receiving this response from Runk, Van Bibber then told him about the weekend incident at Imperial Estates.

"Following this conversation Runk discovered in a local newspaper that Norris had been arrested the night before. Runk conferred with his superior, James McAllister, about the matter. They decided to repossess the trailer even though Norris was current on his account.

"That same morning Runk called Van Bibber to tell him of the bank's decision to repossess. During this conversation Runk informed Van Bibber of the arrest of Norris. At the same time Runk discovered that the newspaper article also recounted the arrest of Ronnie Van Bibber. This was the first information that Van Bibber had received of his son's arrest.

"On November 9 the bank requested Van Bibber to repossess the mobile home. Van Bibber did this on November 20 after the bank agreed to pay the claim of Imperial Estates against Norris. Van Bibber removed the mobile home from Imperial Estates to Van Bibber's trailer park the same day.

"On November 25, 1970, the bank mailed to Norris written notice of the repossession. The bank sent the notice to the former address of Norris at Imperial Estates. The bank gave the notice pursuant to a provision of the bank's insurance coverage.

"Norris, meanwhile, resided in the Marion County Jail from November 9 through the 23rd. From November 24 through December 11 he was in the Crawfordsville jail. It was not until December 11 that Norris was able to obtain release on bail.

"Tom Madden, a relative of Norris, contacted the bank on December 2. He asked how the trailer could be reacquired by Norris. Runk informed Madden that it would be necessary to pay the full amount owing on the contract, the amount reimbursed to Imperial Estates, and the costs of the repossession. Madden pursued nothing further along this line.

"On December 14 the bank received a check from Van Bibber for the repurchase of the home.

"After his release from jail Norris contacted Van Bibber. Van Bibber refused to return the mobile home or its contents unless Norris first paid him $2,580.00. This amount apparently included the balance due on the purchase price together with other claims such as delinquent rent. Norris did not pay this amount. Therefore Van Bibber retained the mobile home and contents.

"Van Bibber stored some of the trailer's contents in a warehouse. These were subsequently destroyed by a fire. Van Bibber removed from the trailer and give to his children a television and a stereo belonging to Norris. Eventually Van Bibber sold the mobile home. The specific circumstances of the sale are not in the record."

Because of our disposition of this case we will discuss first the issue of whether the

repossession was wrongful and then the question of liability for wrongful disposition of the repossessed collateral and loss of the contents of the mobile home.

### I.

### Did the Trial Court Err in Determining That the Repossession was Wrongful?

AFNB argues that the trial court erred as a matter of law in determining that the repossession was wrongful, and claims that there were three separate bases for such repossession: Norris' failure to make a payment when due; insecurity as to the prospect of performance; and the existence of an encumbrance on the collateral.

It also argues, as a separate issue, that the trial court erroneously imposed a duty upon it to give notice of the acceleration and repossession.

### A.

We will first discuss the contention that the trial court erred in holding that AFNB had by its conduct waived its right to unconditional enforcement of the acceleration and repossession terms of the default section of the agreement, and that notice was required before these terms could be enforced.

The trial court found that AFNB, had by continual acceptance of late payments, waived its right to unconditional enforcement of the acceleration and repossession terms of the default section of the agreement, based on failure to make payments on time.

The trial court also made findings of fact that defendants did not give notice to Norris of the AFNB's intention to accelerate the balance due or of its intention of repossess the mobile home, or of the repurchase by Van Bibber. These facts supported the conclusion of law that the acceleration and repossession without notice were wrongful.

The trial court's conclusion that AFNB had waived default ignored the following language in the agreement:

"No waiver by the seller of any default shall be effective unless in writing, nor

operate as a waiver of any other default nor of the same default on a future occasion."

We will refer to this clause as the "non-waiver" clause.

AFNB argues that the missed instalment payment of October 30, 1970, was a default enumerated in the agreement that triggered its rights to acceleration and repossession under the contract and under the Uniform Commercial Code, Ind.Code § 26–1–1–101, et seq.:

"Secured party's right to take possession after default.—Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace...." Ind.Code § 26–1–9–503.

Norris argues initially that regardless of whether AFNB had waived its right to strict compliance with the terms of the contract, the trial court's determination that the repossession was wrongful was based in part on the fact that he was not in default on the date of the repossession because AFNB's own practice called for no action to be taken on a past-due account until it was ten days late. Even if we were to consider the grace period as binding and as superseding the express terms of the contract, we cannot agree that Norris was not in default. While AFNB made its decision to repossess on November 9, the tenth day after payment was due, the actual repossession was on November 20, beyond the grace period. Norris was in default on the October payment at the time the mobile home was repossessed.

Since Norris was delinquent, we must now consider whether the AFNB's pattern of accepting late payments amounted to a waiver of its rights to declare the default and proceed with remedies under the contract.

General rules of waiver are applicable to secured transactions and have been summarized as follows:

"[T]he secured party may not ordinarily establish a pattern of accepting time payments which may be slightly late and then suddenly insist on strict compliance with time provisions and declare a forfeiture; in such case, where the parties have treated the time clause as waived with respect to some payments, the secured party, in order to avail himself of the right of forfeiture for failure to make subsequent payments on time, must give reasonable, definite and specific notice of his changed intention." 79 C.J.S.Supp. *Secured Transactions* § 100 (1974).

This generality, however, does not contemplate the impact on the secured party's rights of the insertion of a non-waiver clause, which has the specific purpose of avoiding the risk of waiver by notifying the debtor in a contract term that the secured party's acceptance of late payments cannot be relied on as treating the time provisions as modified or waived.

Some courts have considered it to be a jury question whether acceptance of late payments amounts to a waiver of the non-waiver clause. *Smith v. General Finance*, (1979) 243 Ga. 500, 255 S.E.2d 14. We consider this approach to be illogical, since the very conduct which the clause is designed to permit—acceptance of late payment—is turned around to constitute waiver of the clause permitting the conduct.

■ We believe the correct approach is that

"[U]nder an installment . . . contract providing that waiver of any default shall not be deemed a waiver of any other or subsequent default, the acceptance of late payments . . . does not constitute a waiver of the secured party's right to demand that payments be made according to contract provisions, or to declare a default and repossess. . . ." 79 C.J.S.Supp. *Secured Transactions* § 100 (1974).

See, e. g. *McAllister v. Langford Investigators, Inc.*, (Ala.App.1980) 380 So.2d 299; *General Grocer Co. v. Bachar*, (1977) 51 Ill.App.3d 907, 8 Ill.Dec. 720, 365 N.E.2d 1106; *Universal C.I.T. Corp. v. Middlesboro Motor Sales, Inc.*, (Ky.1968) 424 S.W.2d 409.

The article on Secured Transactions contains the following provision:

"General validity of security agreement.—Except as otherwise provided by this act [26-1-1-101—26-1-10-106] a security agreement is effective according to its terms between the parties, against purchasers of the collateral and against creditors."

Norris, by signing the retail instalment sale contract, agreed to the terms of the non-waiver clause.

If the security agreement is to be truly effective according to its terms, we must conclude that AFNB did not waive its rights to demand strict compliance and to pursue its contract and statutory remedies.

The question remains, however, whether, even though there was no outright waiver of the rights to declare a default, accelerate, and repossess, there was nevertheless a duty to notify Norris that the rights would be enforced and that the AFNB intended to repossess.

Jurisdictions are split on this question. One approach is to hold that although the non-waiver clause preserves the substantive rights of the secured party to declare a default and repossess the collateral in spite of continual acceptance of late payments, where the fact of such continual acceptance would lead a buyer to believe that his late payments would be accepted and that he would be allowed to catch up in his arrearages, notification of a change in this pattern should be given to the buyer before acceleration and/or repossession. See, e. g. *Cobb v. Midwest Recovery Bureau Co.*, (1980) Minn., 295 N.W.2d 232, 28 UCC Rep. 941; *Ford Motor Credit Co. v. Waters*, (Fla., 1973), 273 So.2d 96.

We note that the former case is not a sound decision, since it begs the question of validity of the non-waiver clause. The cases it cites all stand for the general proposition that notice is a prerequisite to exercise of the right to repossess after continual acceptance of late payments. None of the cases cited in *Cobb* involved a non-waiver clause.

In short, this line of cases properly considers that the secured party has preserved strict compliance through the non-waiver clause, but imposes the duty of notice.

■ Another approach is to hold that since a security agreement is to be enforced according to its terms, an agreement containing a non-waiver and non-modification clause gives the secured party the right to take possession of the collateral without notice upon default. See *Hale v. Ford Motor Credit Co.*, (Ala., 1979), 374 So.2d 849; *Wade v. Ford Motor Credit Co.*, (D.C.E.D. Mo., 1978), 455 F.Supp. 147.

We believe the latter approach better serves the purpose of Ind.Code § 26–1–9–503, and carries out the terms to which Norris agreed. If the non-waiver clause preserves the secured party's right to demand strict compliance, and the debtor's failure to comply with the terms would otherwise give rise to the secured party's right to repossession without notice, then, we believe, the right to repossess without notice is similarly preserved.

As this Court said in analyzing the general concept of waiver:

> " '[T]he vendor may waive strict compliance with the provisions of the contract by accepting overdue or irregular payments, and having so done, equity requires the vendor give specific notice of his intent that he will no longer be indulgent and that he will insist on his right of forfeiture unless the default is paid within a reasonable and specified time. (Citations omitted.)'
>
> *"It follows that where the vendor has not waived strict compliance by acceptance of late payments, no notice is required to enforce its provisions."* (Emphasis added.) *Skendzel v. Marshall*, (1973) 261 Ind. 226, 230–31, 301 N.E.2d 641, 643–44.

Since the secured party here is in the same position, by virtue of the non-waiver clause, as one who never accepted a late payment, we conclude that no notice was required before it could proceed with its contract remedies.

Norris appears to argue that the trial court's conclusion that the repossession was wrongful was based on its findings that strict enforcement of the terms of the agreement would offend the code's pervasive requirement of good faith, and would be unconscionable.

### 1. *Good faith*

The code provides that "[e]very contract or duty within this act imposes an obligation of good faith in its performance or enforcement." Ind.Code § 26–1–1–203. "Good faith" is defined as "honesty in fact in the conduct or transaction." Ind.Code § 26–1–1–201(19). This requirement applies to secured transactions through Ind. Code § 26–1–9–105(4).

Norris reaches into the article governing sales for an additional obligation imposed on *merchants*: "Good faith in the case of merchants means honesty in fact and observance of reasonable commercial standards of fair dealing in the trade." Ind. Code § 26–1–2–103(1)(b). This provision would apply to the original sale between Van Bibber and Norris, but since we are not confronted with any claim of lack of good faith in that transaction, we do not see its relevance here. AFNB is not a merchant:

> "Definitions.—(1) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill." Ind.Code § 26–1–2–104.

■ We note, however, that the absence of a similar burden of observing "reasonable commercial standards" on a secured party reflects the code drafters' recognition that sales transactions are more amenable to establishment of "reasonable commercial standards" than are the relations between secured parties and debtors.

In any event, Norris claims that good faith requires that notice should have been given before repossession.

Since the security agreement here closely tracks the Uniform Commercial Code's provisions authorizing repossession upon default unless the parties have otherwise agreed, and since those provisions are not predicated on the giving of notice, we cannot say that there could be lack of good faith based on the secured party's doing that which the code clearly authorizes it to do.

### 2. Unconsciounability

■ Norris claims that the trial court's determination that the repossession was wrongful could have been based on its determination that the provision allowing acceleration and repossession without notice was unconscionable.

The article on Sales provides:

"Unconscionable contract or clause.— (1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Ind.Code § 26–1–2–302.

And according to § 26–1–9–201, a security agreement is valid to the extent it is not unconscionable, or in some other way offensive to the code.

In support of his claim that the provision is unconscionable, Norris cites three cases which he claims hold that similar provisions were unconscionable particularly where late payments had been accepted.

Reliance on *Fontaine v. Industrial National Bank of Rhode Island*, (1973) 111 R.I. 6, 298 A.2d 521, is misplaced. The secured party in that case had accepted late instalment payments in August and September, and had received timely payment in October, but then repossessed the collateral before the November payment was past due based on the *August* default. There was a non-waiver clause similar to the one in this case. The Rhode Island Supreme Court said that enforcement of such a clause so as

to permit a secured party to declare a default *retroactively* would be unconscionable. The debtor would be subject to the peril of repossession for the duration of the security agreement, despite timely subsequent payments, based on a past default. But the *Fontaine* court was not faced with the question whether under the security agreement before it a default in November would have given rise to the right to repossess in November.

*Kosches v. Nichols*, (1971) 68 Misc.2d 795, 327 N.Y.S.2d 968, is not on point. It dealt with the constitutionality of a prejudgment attachment statute, which the court held unconstitutional in light of *Sniadach v. Family Finance*, (1969) 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349. It is well-settled that self-help provisions authorized by Ind.Code § 26–1–9–503, do not involve state action invoking constitutional protection. See, e. g. *Gibson v. Dixon*, 579 F.2d 1071 (7th Cir., 1978); *Adams v. So. Calif. First National Bank*, 492 F.2d 324 (9th Cir., 1973), cert. den'd., (1974) 419 U.S. 1006, 95 S.Ct. 325, 42 L.Ed. 282.

*Chrysler Credit Corp. v. Barnes*, (1972) 126 Ga.App. 444, 191 S.E.2d 121, did not involve the problem of acceptance of late payments, but did involve the validity of an acceleration clause. The Georgia Court of Appeals held that the language of the particular clause precluded the secured party from exercising the option to declare the entire balance due on default unless notice was communicated to the debtor. The court did not decide whether by other language the acceleration provision could have been made to be selfexecuting.

No cogent argument is presented in support of the claim that the trial court determined that the clause permitting acceleration and repossession without notice was unconscionable. Indeed, no evidence was presented at the trial on this issue and the trial court made no findings of fact or conclusions of law that any part of the security agreement was unconscionable. In dealing with a claim that an acceleration clause of a contract was unconscionable, the New Jersey Supreme Court, after scrutiniz-

ing the factual record and finding nothing that would justify it in declaring such a clause (which it noted is universally accepted in the business world) to be unconscionable on its face or as applied in the particular facts, said:

"In the absence of extraordinary circumstances demonstrating oppression or grossly unfair dealing or the like not here present, or conflict with the public policy of the state ... the court should not declare unconscionable the provisions ... deliberately agreed to in the contract between the parties in this case." *King v. South Jersey National Bank*, (1974) 66 N.J. 161, 330 A.2d 1.

We decline to hold the acceleration and repossession clause unconscionable.

The trial court erred in holding that there was no basis for repossession based on the October 30 delinquency and in holding that notice was required before the acceleration clause could be enforced.

### B.

Appellants argue that the trial court erred in concluding that the bank was not "insecure" at the time of the repossession and could not in good faith have deemed themselves insecure, and that Norris established by a preponderance of the evidence that the bank acted in bad faith.

■ The bank argues that the trial court applied incorrect standards as to what constitutes good faith insecurity.

The code provides:

"Option to accelerate at will.—A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral 'at will' or 'when he deems himself insecure' or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised." Ind.Code § 26–1–1–208.

Insecurity may be found either as to the debt itself or as to the collateral. *Univ. C.I.T. Credit Corp. v. Shepler*, (1975) 164 Ind.App. 516, 329 N.E.2d 620.

The basis for the trial court's conclusion is summarized in the following findings of fact:

"5. That defendant, American Fletcher National Bank & Trust Company authorized the defendant, Virgil Van Bibber to accomplish the repossession of the mobile home, as their agent. That at the time the repossession was ordered the defendants knew or should have known that:

"(1) The plaintiff was no more than 10 days overdue on the October payment.

"(2) The plaintiff had paid approximately 70% of the contract price.

"(3) The value of the collateral exceeded the balance due on the contract.

"(4) The defendant, American Fletcher National Bank & Trust Company had a repurchase agreement with the Van Bibber Lake Retreat, Inc. and would suffer no monetary loss.

"(5) That defendant, American Fletcher National Bank & Trust Company had previously prevailed upon plaintiff's mother to make up past due payments and could reasonably expect to do so again.

"(6) That the plaintiff was presumed to be innocent until proven guilty of any criminal charges pending against him.

"(7) That the plaintiff was entitled to release from jail pending trial upon the posting of bail in a reasonable amount."

We agree that reliance on these facts is erroneous. The relevant facts of this case lead unerringly to the conclusion that Norris did not establish lack of good faith.

Norris' claim of lack of good faith was based in his theory that Van Bibber, motivated by personal animus, prevailed upon the bank to repossess. We do not need to examine this claim, since the evidence clearly supports the conclusion that the bank had valid reasons for deeming itself insecure.

First, the bank had had a continuing problem of collecting from Norris, and he was delinquent on the current payment due. His arrest certainly impaired his prospects of making the current and subsequent payments. The bank did not have an obligation to await the outcome of the criminal proceedings against him. In addition, insecurity existed as to the collateral. The arrest meant that the mobile home would be unoccupied for an indefinite period, placing it in jeopardy. Moreover, the action by Imperial Estates Mobile Homes Park owners imperiled the collateral and was a valid basis for insecurity. This last factor was in itself an independent basis for default which we will discuss below.

Norris did not meet his burden of proving that the bank did not in good faith deem itself insecure.

### C.

The bank urges that the trial court erred in ignoring the existence of another basis for acceleration and repossession, Imperial Estates' lien.

Norris answers that trial court did not err because the temporary restraining order did not constitute a lien but was merely an order restraining him from removing the trailer. Even if Imperial Estates had a lien for unpaid rent, Norris continues, such a lien could not reasonably be the form of encumbrance referred to in the security agreement, because this would allow unscrupulous creditors to repossess collateral with impunity whenever the lot rental was overdue.

Norris' concern is unnecessary since the provisions of Ind.Code § 26–1–9–504 regarding notice of resale and the obligation to account to the debtor for any surplus effectively remove any incentive for arbitrary repossessions.

■ The temporary restraining order did not, as Norris points out, declare a lien in favor of Imperial Estates. There was, however, an already existing statutory lien pursuant to Ind.Code § 13–1–7–33 (Burns 16–9–2B–33) (lien on property of guest). This

lien is perfected by mere possession, and has a priority over a perfected security interest under Ind.Code § 26–1–9–310. The temporary restraining order, therefore, protected the mobile home park owner's statutory lien. A lien is an encumbrance.

The trial court erred in ignoring the attachment of a superior lien which was an independent basis for acceleration and repossession.

### D.

■ Finally Norris argues that overshadowing the entire question of the wrongfulness of appellant's repossession and acceleration is the fact that at all material times the bank was fully protected against loss by the repurchase terms of the assignment. This argument supports his theory that no genuine basis for repossession was present and that it was based entirely on malice. This contention has no merit, since Van Bibber's obligation to repurchase was contingent upon the bank's repossession of the collateral.

We hold that the trial judge misapplied the law in this case. There were three independent grounds justifying acceleration of payment and repossession of the collateral without notice: 1) the delinquent October 30 payment; 2) insecurity in good faith; and 3) the existence of an encumbrance.

We therefore vacate the judgment of the trial court against AFNB and enter judgment for the bank on all claims. We vacate the judgment of the trial court against the Van Bibber defendants to the extent that it was based on the determination that the repossession was wrongful and malicious.

### II.

Was the Secured Party Liable for Wrongful Disposition of the Repossessed Collateral and for the Loss of the Contents of the Mobile Home?

Regarding Norris' claim against the Van Bibber defendants for conversion of the mobile home and for loss of its contents, we remand the case for a new trial. We cannot determine from the trial court's find-

ings to what extent the damages assessed against the Van Bibber defendants were based on the wrongful repossession as opposed to the claimed wrongful disposition of the collateral.

As to the claim of wrongful disposition of the repossessed collateral and of loss of the contents of the mobile home, the Van Bibber defendants are in a different posture from AFNB.

The Van Bibber defendants argue on appeal that they have no liability arising from the resale of the mobile home. They claim that they are actually three separate entities: the Van Bibber partnership which sold the trailer to Norris; the Corporation, which purchased the mobile home from the bank after repossession; and the natural person, Virgil Van Bibber.

According to this theory, if the repossession was wrongful none of the Van Bibber entities could be liable since whichever one was involved was merely an agent of the bank. Since we hold that the repossession was not wrongful, we need not consider this claim.

Under this theory, however, the Van Bibber corporation claims to have been a stranger to the initial sale and to the repossession, and to have entered the picture only as a purchaser in an outright sale by the bank of the repossessed collateral. Van Bibber, Inc., argues that it was never under any obligation to Norris, citing, Ind.Code § 26–1–9–504(4):

"When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this part or of any judicial proceedings.

"(a) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or

"(b) in any other case, if the purchaser acts in good faith."

Van Bibber, Inc., argues that the trial court's finding of fact that defendant Van Bibber did not dispose of the mobile home in a commercially reasonable manner is based on error as to the nature of the transaction between the bank and Van Bibber, Inc., and as to the status of Van Bibber, Inc., in the transaction.

■ The Van Bibber defendants did not disclose this theory in their answer or during the trial, but raised it for the first time in the motion to correct errors. Their answer and trial strategy focused solely on the propriety of the repossession and the propriety of their possession of the collateral.

They are barred from raising this claim this late in the proceedings. Even if we were to entertain this claim, we find the evidence to be quite clear that the same Van Bibber entity sold the mobile initially, repurchased the collateral from the bank. Van Bibber, Inc.'s position in its pleadings was that the repossession was proper and that its possession of the mobile home was pursuant to the bank's right of full recourse against it under the terms of the assignment of the security agreement. In his trial testimony Virgil Van Bibber repeatedly referred to the transaction between himself and the bank as a repurchase pursuant to the terms of the assignment. The amount paid by Van Bibber, Inc., for the mobile home was for the exact amount of the balance due from Norris, and the check for the payment contained the notation, "Payoff on Wm. C. Norris Repo."

The transaction was a repurchase. Indiana Code § 26–1–9–504(5) provides that "a person who is liable to a secured party under a . . . repurchase agreement . . . and who receives a transfer of the collateral from the secured party . . . has thereafter the rights and duties of the secured party."

Indiana Code § 26–1–9–504(3) provides that "[u]nless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized

market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made shall be sent by the secured party to the debtor. . . ."

Since the parties in their stipulations agreed that the debtor had paid 60% of the cash price, an additional duty was on the secured party pursuant to Ind.Code § 26–1–9–505:

"[A] secured party who has taken possession of collateral [on which the debtor has paid 60% of the cash price] must dispose of it under section [26–1–] 9–504 and if he fails to do so within ninety [90] days after he takes possession the debtor at his option may recover in conversion or under section [26–1–] 9–507(1) or the secured party's liability."

Indiana Code § 26–1–9–507, provides in pertinent part:

"If it is established that the secured party is not proceeding in accordance with the provisions of this part disposition may be ordered or restrained on appropriate terms and conditions. If the disposition has occurred the debtor . . . has a right to recover from the secured party any loss caused by a failure to comply with the provisions of this part. If the collateral is consumer goods, the debtor has a right to recover in any event an amount not less than the credit service charge plus ten per cent of the principal amount of the debt or the time-price differential plus ten per cent of the cash price."

· We remand this cause for a new trial on the sole issue of whether the Van Bibber defendants complied with the provisions of Ind.Code § 26–1–9–504 and § 26–1–9–505, and whether they are liable for the loss of the contents, noting that the record reveals that the bank, prior to the repurchase by Van Bibber, Inc., sent a notice of resale to Norris by certified mail to his Imperial Estates address.

Reversed in part and remanded for new trial in accordance with this opinion.

GIVAN, C. J., and HUNTER, PRENTICE and PIVARNIK, JJ., concur.