Andrew C. BROWN, Appellant
(Plaintiff Below),

v.

The INDIANA NATIONAL BANK,
Appellee (Defendant Below).

No. 4–983A325.

Court of Appeals of Indiana,
Fourth District.

April 17, 1985.

Rehearing Denied May 29, 1985.

Douglass R. Shortridge, Indianapolis, for appellant.

Richard D. Wagner, Max W. Hittle, Jr., Indianapolis, Michael J. Antrim, Church, Roberts & Beerbower, Noblesville, for appellee.

CONOVER, Judge.

Plaintiff-Appellant Andrew C. Brown (Brown) appeals the trial court's granting of a motion for judgment on the evidence in favor of the Indiana National Bank (INB).

We affirm.

### ISSUE

Did the trial court err in granting INB's motion for judgment on the evidence at the close of all the evidence?

### FACTS

Brown signed a contract in July, 1974 to play professional hockey for the Indianapolis Racers hockey franchise, then owned by IPS Management, Inc. Under the contract's terms, Brown was to play for 5 years, starting with the 1974–75 season. The contract also provided Brown could not be traded without his written consent. Finally, the contract provided for salary payments and an "interest factor". Both were to be paid over the first 5 years and the "interest factor" to be continued to be paid over the remaining 5 years. IPS Management shortly thereafter sold its hockey franchise to Indianapolis Racers, Ltd. (Racers, Ltd.).

Racers, Ltd. initially borrowed $500,000 from INB in late 1974. INB took a security interest in Racers, Ltd.'s assets, including all players' contracts. INB perfected this security interest by filing a financing statement in January, 1975. INB subsequently loaned Racers, Ltd. additional funds over the next two years, and took security interests in similar collateral.

By 1977, Racers, Ltd. was experiencing financial difficulties and had borrowed from INB nearly $1,000,000. In April, 1977, INB requested Racers, Ltd. to deliver to it copies of its players' contracts, one of which was Brown's. Racers, Ltd. complied. On June 3, 1977, INB called all previous Racers, Ltd. loans. INB notified Racers, Ltd. it (INB) would take possession of all Racers, Ltd. secured collateral which included Brown's player contract and would sell the same at a private sale to be held on or before June 13, 1977. INB, in June and July of 1977, made at least two salary payments to Brown after it took possession of his player contract.

Canadian businessman Nelson Skalbania (Skalbania) offered to buy various Racers, Ltd. assets. Skalbania formed the limited partnership Hockey World Ltd. (HW, Ltd.). He also formed a new organization, Indianapolis Racers, 1977 (Racers '77) and made it a general partner of HW, Ltd. In November, 1977, INB transferred nearly all of Racers, Ltd.'s assets to HW, Ltd. and in exchange received a 20% limited partnership interest in HW, Ltd. HW, Ltd., however, did *not* purchase Brown's player contract.

Unable to find a buyer, INB returned Brown's contract to the general partner of Racers, Ltd., in January, 1978 and reaffirmed its security interest therein. INB never received money from its 20% limited partnership status in HW, Ltd. INB lost an estimated 1.2 million dollars on Racers, Ltd. loans. Likewise, Brown was paid for the first three years of his player contract, up to the 1976–77 season. He has received no further payment.

Brown sued INB for fraud in its failure to notify him of (a) the security agreement it executed with Racers, Ltd. initially taking his player contract as collateral; (b) INB's possession of the player contract once Racers, Ltd. defaulted on its loans; and (c) INB's intention to sell Racers, Ltd. assets at a private sale. Brown also alleged a breach of INB's duty of good faith in regards to these transactions.

The case was tried initially before a jury. The trial court denied INB's motion for judgment on the evidence made at the end of Brown's case. However, INB renewed this motion at the close of all the evidence. The trial court granted the motion. Brown appeals.

### DISCUSSION AND DECISION

#### I. *Standard of Review*

We review a trial court's ruling on a motion for judgment on the evidence in the same light as the trial court. We look at the evidence and reasonable inferences therefrom most favorable to the non-

moving party. Judgment on the evidence in favor of a party is proper where there is an absence of evidence[1] or reasonable inferences which support an essential element of the nonmoving party's claim. *Jones v. Gleim* (1984), Ind., 468 N.E.2d 205, 206; *Dettman v. Sumner* (1985), Ind.App., 474 N.E.2d 100, 103; *Perry v. Leo P. Knoerzer Corporation* (1984), Ind.App., 472 N.E.2d 223, 225. Our third district has stated "if there is evidence on *each* element of the claim, the issue should be tendered to the jury and the motion denied." *Farm Bureau Insurance Co. v. Crabtree* (1984), Ind.App., 467 N.E.2d 1220, 1225; *see also Thatcher Engineering Corp. v. Bihlman* (1985), Ind.App., 473 N.E.2d 1022, 1024–25. Conversely, the issue should not go to the jury if there is no evidence on one or more essential elements of the claim. Thus Brown may overcome a motion for judgment on the evidence only if he presented evidence at trial on each element of his claim, one being INB's duty to disclose.

## II. *Judgment on the Evidence*

Brown's amended complaint alleges INB had a duty to notify Brown of various events occurring after INB took a security interest in Racers, Ltd. assets. Had INB fulfilled its duty, Brown opines, he could have taken steps to minimize the loss he suffered by either suing Racers, Ltd. for breach of contract or declaring himself a free agent enabling him to accept a player contract elsewhere. We find INB owed Brown no duty to inform him of these events.

### *Fraud*

■ Although not susceptible to a precise definition, broadly stated, fraud is any act, omission or concealment which involves breach of a duty causing damage as a result. *Hinds v. McNair* (1980), Ind. App., 413 N.E.2d 586, 603. Fraudulent concealment is one type of actionable fraud in which one having a duty to disclose certain facts to another knowingly fails to do so, and as a result, the other relies upon this nondisclosure to his detriment. *See, generally, Barnd v. Borst* (1982), Ind.App., 431 N.E.2d 161, 168; *Fleetwood Corp. v. Mirich* (1980), Ind.App., 404 N.E.2d 38, 47; *Grow v. Indiana Retired Teachers Community* (1971), 149 Ind.App. 109, 118, 271 N.E.2d 140, 145. The party asserting fraud bears the burden of establishing the wrongdoer's duty to disclose. *Barnd*, 431 N.E.2d at 168; *Grow*, 271 N.E.2d at 145.

### a. *INB's Duty to Disclose Under Article 9*

■ At trial, Brown argued INB had a duty of disclosure under Article 9 of Indiana's Uniform Commercial Code. We find no such duty.

Brown first claims INB should have notified him it took a security interest in his player contract. However, a security agreement is a contract between the creditor and debtor allowing the creditor to take a security interest in specified collateral. *See* IC 26–1–9–201. A security interest created by such agreement may be perfected by filing a financing statement. This financing statement serves as notice to the *rest of the world* the secured party has taken a security interest in the collateral. *See* IC 26–1–9–303. INB fulfilled any duty it had under Article 9 to notify Brown by properly filing a financing statement.

Brown next contends INB should have notified him it intended to sell his player contract at a private sale and it was taking possession of Racers, Ltd. assets.

■ Article 9 of Indiana's Uniform Commercial Code governs secured transactions

---

1. This district in *Dettman v. Sumner*, (1985), Ind.App., 474 N.E.2d 100, further discussed the two-part test established in *American Optical Co. v. Weidenhamer* (1983), Ind., 457 N.E.2d 181 used in determining whether a motion for judgment on the evidence should be granted. The first prong consists of determining whether, *quantitatively, any* reasonable evidence supporting the nonmoving party's claim exists. An *absence* of such evidence would warrant granting the T.R. 50(A) motion. Here, Brown presented no evidence INB owed him a duty to disclose certain facts in the first place. We need not proceed to the second part of the test dealing with the qualitative nature of evidence actually presented.

whereby tangible or intangible personal property or fixtures are made to serve as security for an obligation. A creditor with a security interest in a debtor's property is a secured party. A security interest is "an interest in the personal property or fixtures securing payment or performance of an obligation." IC 26–1–1–201(37); *see also,* IC 26–1–9–105(h); (i). Where the debtor defaults on the obligation owed, the secured party may take possession of the collateral put up by the debtor and thereafter dispose of it by public or private sale. The proceeds are used to satisfy the indebtedness. IC 26–1–9–503, 9–504. However 26–1–9–504(3) requires (1) the secured party electing this remedy to send notice thereof to the debtor, and (2) the method, manner, time, place and terms of the sale must be commercially reasonable:

.        .        .        .        .

(3) Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. Sale or other disposition may be as a unit or in parcels and at any time and place and on any terms but every aspect of the disposition including the method, manner, time, place and terms must be commercially reasonable. Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time and place of any public sale or reasonable notification of the time after which any private sale or other intended disposition is to be made *shall be sent by the secured party to the debtor, and* except in the case of consumer goods to *any other person who has a security interest in the collateral* and who has duly filed a financing statement indexed in the name of the debtor in this state or who is known by the secured party to have a

security interest in the collateral.[2] (Emphasis and footnote added.)

Thus, this section carves out three classes of persons entitled to notice of disposition of collateral, namely (1) the debtor; (2) one known by the secured party to have a security interest in the same collateral; and (3) one having a security interest in the same collateral. Furthermore "debtor" in turn

means the person who owes payment or other performance of the obligation secured, whether or not he owns or has rights in collateral, and includes the seller of accounts, contract rights or chattel paper. Where the debtor and the owner of the collateral are not the same person, the term "debtor" means the owner of the collateral in any provision of the Article dealing with the collateral, the obligor in any provision dealing with the obligation, and may include both where the context so requires; (footnote omitted)

IC 26–1–9–105(1)(d). This district recently has held an unconditional guarantor of liabilities arising from an equipment lease which is really a security agreement is a "debtor", and thus entitled to notice under IC 26–1–9–504(3). *McEntire v. Indiana National Bank* (1984), Ind.App., 471 N.E.2d 1216, 1224. Other jurisdictions have held "debtor" also includes a guarantor or accommodation maker of a promissory note evidencing the obligation to the secured party. As these parties would be called upon to pay any deficiency in the event of default, they too, like the primary debtor, are entitled to notice of disposition of the collateral. See, *Motorola Communications & Electronics, Inc. v. National Patient Aids, Inc.* (1983), Fla.App., 427 So.2d 1042, 1044; *National Exceptance Co. of America v. Medlin* (N.D.Ill.1982), 538 F.Supp. 585, 587; *First National Bank v. Cillessen* (1980), Colo.App., 622 P.2d 598, 600–601. However, one court has

---

**2.** The 1972 amendments to the UCC, not adopted in Indiana, slightly changed this section to provide reasonable notification shall be sent by the secured party to the debtor *if he has not signed after default a statement renouncing or modifying his right to notification of sale.* It

also provides the secured party must also notify any other secured party who has given him a written notice of a claim of an interest in the collateral. This relieves the first secured party's burden of checking whether other secured parties filed financing statements.

held non guarantor stock holders of a debtor corporation are not "debtors" and therefore not entitled to notice of disposition under 9–504(3). *Re: Estate of Bluestone v. General Electric Credit Corp.* (1982), 121 Mich.App. 659, 329 N.W.2d 446, 451.

■ The security agreement executed on January 2, 1975, between Racers, Ltd. and INB named "Indianapolis Racers, Ltd." as "borrower" exclusively. It gave INB a security interest in "the Indianapolis Racer World Hockey Association franchise and all player contracts now existing or hereafter arising." Brown's only interest in his player contract constituting part of the collateral was his right to compensation as an employee provided he fulfilled the conditions of his player contract. He by no means had a security interest in this collateral.

■ Furthermore, Brown was not liable either as a primary debtor or guarantor on the underlying obligation for which the collateral was secured, i.e., Brown himself would not have been personally liable on the loans INB extended to Racers, Ltd. The security agreement was signed only by Racers, Ltd.'s general partner and chairman of the board. INB had no duty under IC 26–1–9–504(3) to notify Brown of the planned sale since Brown was neither a debtor nor had a security interest in the collateral.

■ Nor did INB owe Brown a duty to notify him it took possession of Racers, Ltd.'s assets, including his player contract. IC 26–1–9–504(3) allows a secured party to take possession of the secured collateral upon default without judicial process provided it can be done without breach of the peace. INB contacted Racers, Ltd., debtor, and requested it turn over all players' contracts. Racers, Ltd. complied. No judicial process was needed and hence no "breach of the peace" occurred where the debtor consented to a secured party's taking possession of the secured collateral. See, White and Summers, *Uniform Commercial Code* (2nd Ed.1980) § 26–6, p. 1097. INB did notify the debtor, Racers, Ltd. it was taking possession of the collateral. It

was not obligated to so inform Brown, absent his status as a "debtor".

■ Although our determination INB was under no duty to notify Brown of its security interest or of its intent to put Racers, Ltd. assets up for sale is sufficient to dispose of this case, we deem it appropriate to address Brown's contention INB failed in its duty to dispose of the secured collateral in a commercially reasonable manner.

INB took possession of Brown's player contract in April, 1977. Racers, Ltd. defaulted on its loans the same summer. The World Hockey Association (WHA), the hockey league to which Racers, Ltd. belonged, likewise was in financial straits and scheduled meetings to discuss the possibility of either merging with the National Hockey League (NHL) or working out alternatives for WHA teams not taken into the NHL under the merger. INB attended these meetings, making it clear it did so as a creditor of Racers, Ltd. In the event of a merger, WHA teams not admitted perhaps would have been entitled to a cash indemnity payment. This would have enabled INB to apply the cash to which it was entitled as creditor, to Racers, Ltd.'s outstanding indebtedness. Furthermore, such meetings were the most appropriate marketplace to sell Brown's contract, a unique collateral. INB also paid Brown two salary payments to keep his player contract current.

In August, 1977, Skalbania agreed to purchase some but not all Racers, Ltd. assets. Two months later, Racers, Ltd. transferred most of its assets to Skalbania's newly formed limited partnership. Players' contracts including Brown's were not transferred. INB's continued efforts to sell Brown's contract were unsuccessful. Finally, INB returned Brown's unsold player contract to Racers, Ltd. in January, 1978. Given the unique nature of the collateral secured, the record demonstrates INB dealt with the collateral it sold in a commercially reasonable manner. Regarding Brown's player contract which it did not sell, INB nevertheless took commercial-

ly reasonable measures in its attempt to dispose of it. See, *Michigan National Bank v. Marston* (1970), 29 Mich.App. 99, 109, 185 N.W.2d 47, 51–52 (even though bank did not actually sell collateral, attempts to sell were commercially reasonable under the circumstances).

■ The last duty under Article 9 Brown claims INB owed him was to act in "good faith" regarding the events occurring from the time INB took a security interest in Brown's contract to the point INB returned the unsold contract and reaffirmed its security interest.

The obligation to exercise good faith[3] extends to "every contract or duty" within the Uniform Commercial Code. IC 26–1–1–203; *Van Bibber v. Norris* (1981), 275 Ind. 555, 419 N.E.2d 115, 122. This obligation applies equally to secured transactions under Article 9. IC 26–1–9–105(4); *Van Bibber*, 419 N.E.2d at 122. Since this "good faith" requirement applies to duties under Article 9, a duty owing under the UCC must first be established. Brown provides no cogent argument or citation of authority establishing a duty independent of the duties of notification or commercially reasonable disposition of the collateral he claims were owed him by INB which we have already discussed. Having found INB owed no duty to Brown, he is in no position to assert INB failed to exercise such duties in "good faith" under IC 26–1–1–203.

### b. *Contractual Duty to Disclose*

Brown suggests INB had a duty under his player contract to disclose certain events. He premises this contention on the claim the agreement between Racers, Ltd. and INB actually operated as an assignment rather than a security interest.

■ A security interest is "an interest in personal property or fixtures which secures payment for performance of an obligation." IC 26–1–1–201(37). An assignment is a transfer which confers a complete and present right in a subject matter to the assignee. *Title Guarantee and Surety Co. of Scranton, Pennsylvania v. State* (1915), 61 Ind.App. 268, 274, 109 N.E. 237, 239. In determining whether an assignment has been made, the question is one of intent. *L'il Red Barn, Inc. v. Red Barn System, Inc.* (N.D.Ind.1970), 322 F.Supp. 98, 106. A written agreement assigning a subject matter must manifest the assignor's intent to transfer the subject matter clearly and unconditionally to the assignee. 6A C.J.S. *Assignments*, § 49 (1975). The assignee takes no greater rights than those possessed by the assignor. *University Casework Systems, Inc. v. Bahre* (1977), 172 Ind.App. 624, 636, 362 N.E.2d 155, 163.

■ The agreement between Racers, Ltd. and INB labeled "security agreement" provided in part:

The Borrower grants to The Indiana National Bank ("Bank"), a security interest in the Borrower's accounts, contract rights, instruments, tangible intangibles and general intangibles now owned and hereafter acquired together with all proceeds thereof, including but not limited to the following:

(1) The Indianapolis Racer World Hockey Association franchise and all player contracts now existing or hereafter arising;

(2) Proceeds of all gate receipts which may be due the Borrower as a result of all Indianapolis Racer games now existing or hereafter arising;

(3) Proceeds derived from all radio and television rights and agreements connected with the broadcasting of Indianapolis Racer games, now existing or hereafter arising;

in order to secure the payment and performance of all Liabilities of the Borrower in favor of the Bank.

It also described INB's possessory rights in the collateral in the event of default:

---

**3.** "Good faith" means "honesty in fact in the conduct or transaction" IND.CODE 26–1–1–201(19).

*Upon the occurrence of any of the above events of default* and at any time thereafter (such default not having previously been cured) the Bank shall have, in addition to all other rights and remedies, the remedies of a secured party under the Uniform Commercial Code as adopted by the State of Indiana (regardless of whether the Code has been enacted in the jurisdiction where rights or remedies are asserted) including, without limitation, the right to take possession of the Collateral. (Emphasis supplied).

This language clearly did not unconditionally transfer ownership rights to INB. Instead, INB could exercise its right to possession only upon Racers, Ltd.'s default. This agreement clearly established a security interest and not an assignment of the specified collateral. Therefore it is governed by Article 9, as we have determined, INB owed no duties to Brown under it. Whatever the duties of disclosure imposed by Brown's player contract, they remained the exclusive responsibility of Racers, Ltd.[4]

Brown not only failed to present sufficient evidence INB failed to discharge its duty to disclose; he also failed to establish INB initially owed such a duty to him. The trial court properly granted INB's motion for judgment on the evidence.

Affirmed.

MILLER, P.J., and YOUNG, J., concur.

---

4. Even had the agreement here between Racers, Ltd. and INB been construed as an assignment, we cannot say it *per se* called for INB to perform Racers, Ltd. obligations under Brown's player's contract. Only rights arising under a contract may be "assigned". *University Casework Systems, Inc. v. Bahre* (1977), 172 Ind.App. 624, 631, 362 N.E.2d 155, 160. Racers, Ltd. under Brown's player contract had the right to receive Brown's services as a professional hockey player. Assuming this type of contract was assignable, *see,* 6 *Am.Jur.2d Assignments* § 13 (1963), duties under the contract assigned may be delegated to the assignee, but an assignment of contractual rights "does not *sua sponte* carry with it the delegation of contractual duties." *University Casework,* 172 Ind.App. at 631, 362 N.E.2d at 160. *See also,* 6 *Am.Jur.2d Assignments* § 109 (1963).