**CANADA DRY CORPORATION,
Plaintiff-Appellant,**

v.

**NEHI BEVERAGE COMPANY, INC. OF
INDIANAPOLIS, Defendant-Appellee.**

No. 82–2391.

United States Court of Appeals,
Seventh Circuit.

Argued May 25, 1983.

Decided Dec. 2, 1983.

Henry J. Price, Barnes & Thornburg, Indianapolis, Ind., for plaintiff-appellant.

Terrill D. Albright, Baker & Dainels, Indianapolis, Ind., for defendant-appellee.

Before WOOD and CUDAHY, Circuit Judges, and WYATT, Senior District Judge.*

CUDAHY, Circuit Judge.

Plaintiff Canada Dry Corporation ("Canada Dry"), a franchisor of "Canada Dry" soft drinks, appeals from the portion of a judgment based on several jury verdicts in favor of its former franchisee, the Nehi Beverage Company of Indianapolis ("Nehi"). The verdicts appealed by Canada

* Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

Dry are for breaches of contract, illegal discrimination among franchisees in violation of the Indiana Deceptive Franchise Practices Act, IND.CODE § 23–2–2.7–1, *et seq.* (1976), and for compensatory and punitive damages. Nehi has not appealed verdicts for Canada Dry on Canada Dry's claims for trademark infringement and amounts owing on account. We have jurisdiction on the basis of Canada Dry's claim for trademark infringement, 28 U.S.C. § 1338(a), and diversity of citizenship, 28 U.S.C. §§ 1291, 1332. We affirm the judgment for Nehi on the breach of contract claims and the award of compensatory damages based on those claims and reverse the illegal discrimination verdict and damages based on it and the award of punitive damages.

I

In 1968, Canada Dry entered into a licensing agreement with Nehi, which gave Nehi the right to manufacture, bottle, sell and distribute "Canada Dry" soft drinks in certain specified market areas. This agreement remained in effect until September 12, 1974, when Canada Dry notified Nehi that it intended to terminate the agreement, effective as of December 20, 1974. Nehi then sued Canada Dry for wrongful termination. The details of this first lawsuit are unimportant in this appeal, except insofar as its settlement gave rise to a new agreement. The subsequent termination of this second agreement is the subject matter of this case.

The parties entered into the agreement in controversy on October 28, 1977. It contained the text of the original contract with substantial amendments, including, *inter alia,* provisions expanding Nehi's sales "territory" to include, on a conditional basis, Galveston and Lafayette, Indiana, permitting Nehi to market ginger ale as a soft drink (pending "further review" in conjunction with Canada Dry) and providing for investment by Nehi in bottling glass, divi-

sion of advertising and promotion expenses and the establishment of marketing goals.

Disputes under the new agreement developed almost immediately. One problem area was the marketing of ginger ale as a soft drink.[1] In December, 1977, Canada Dry presented Nehi with a detailed soft drink marketing program, under which Canada Dry would underwrite half of the first year media expenses and reimburse Nehi at a rate of $.15 per case on promoted sales. The parties, however, were not able to agree as to when the program should be initiated, and the program was never implemented. Another area of dispute involved the Lafayette and Galveston territories. Nehi complained that Canada Dry failed to prevent its prior distributors from competing with Nehi in the Lafayette and Galveston territories during 1978. The parties also disagreed as to whether Nehi had complied with the agreement's provisions concerning Nehi's rights to this territory. Although the contract required Nehi to exercise an option in writing by December 15, 1978, in order to make its acquisition of the Lafayette and Galveston territories permanent, Nehi failed to exercise its option. Canada Dry did not, however, object to continued sales by Nehi in the territories, and, on November 8, 1979, retroactively extended Nehi's right to the Galveston and Lafayette territories for a nonrenewable one year term, which was to expire on February 28, 1980. Finally, there was also substantial controversy over Nehi's compliance with Canada Dry's quality standards.

Citing numerous alleged breaches of the franchise agreement, Canada Dry filed this suit on April 18, 1980, seeking damages for breach of contract, trademark infringement on account of Nehi's continued activity in the terminated Lafayette and Galveston territories and for amounts owing on account. Nehi counterclaimed, seeking compensatory and punitive damages for breach of the agreement, violation of the Indiana Deceptive Franchise Practices Act,

---

1. Ginger ale may be used as a mixer with alcoholic beverages or imbibed by itself as a "soft drink." Canada Dry hoped to promote the latter use.

IND.CODE § 23–2–2.7–1, *et seq.,* and tortious breach of contract.

Canada Dry terminated the entire agreement prior to trial of this action after an inspection on September 2, 1980, revealed yeast contamination in Canada Dry ginger ale stored at Nehi's warehouse. Plans for sanitization of the plant were cancelled. The termination was effective September 3, 1980.

A sixteen day jury trial on Canada Dry's claims and Nehi's counterclaims commenced on September 15, 1981. By agreement of the parties, United States Magistrate Gene B. Lee presided. After all the evidence was presented, Canada Dry moved for a directed verdict on each of Nehi's claims for compensatory and punitive damages. This motion was denied, and the case was submitted to the jury. The jury returned six separate verdicts. The jury: (1) awarded Nehi $100,609.01 compensatory damages on its breach of contract claim; (2) awarded $25,-000 to Canada Dry for trademark infringement; (3) awarded $8,640 to Canada Dry for amounts owing on account; (4) awarded $200,000 to Nehi on its claim of unlawful discrimination under the Indiana Deceptive Franchise Practices Act, IND.CODE § 23–2–2.7–2(5); and (5) awarded punitive damages of $300,000 to Nehi. Canada Dry appeals verdicts (1), (4), and (5). We uphold the jury's finding of liability on the part of Canada Dry for breach of contract and its award of compensatory damages. We disapprove Magistrate Lee's denial of Canada Dry's motion for a directed verdict on Nehi's discrimination claim and disapprove the award of punitive damages on the breach of contract claim.

II

Breach Of Contract Claims

■ The jury awarded approximately $100,000 to Nehi for damages resulting from Canada Dry's wrongful breaches of the franchise agreement. Nehi asserted at trial that Canada Dry breached its contractual duties by terminating the franchise

and by failing to implement a soft drink program with Nehi. Recognizing that our standard of review of a jury verdict is one of deference,[2] we turn to a consideration of the various claims raised by the parties.

A. Performance Deficiencies

Canada Dry cites fourteen discrete breaches of the franchise agreement for the purpose of showing that it was justified in terminating Nehi's franchise. The alleged breaches include: Nehi's use of sweeteners not approved by Canada Dry; the failure of Nehi to remove chlorine satisfactorily from its water supply; Nehi's use of syrups beyond the syrups' expiration date; Nehi's failure to run tests for yeast contamination; discovery of yeast contamination in Canada Dry products stored in Nehi's warehouse; failure of Nehi to monitor the quality of Canada Dry tonic water; undercarbonation of Canada Dry ginger ale; failure by Nehi to send product samples to Canada Dry; the inability of Nehi's quality control manager, Charles Harden, to carry out procedures mandated by Canada Dry; Nehi's decision not to produce the Canada Dry beverages, "Hi-Spot" and "Tahitian Treat"; Nehi's failure to produce 10-ounce products or to install a rinser machine needed to do so; certain unauthorized syrup exchanges between Nehi and other Canada Dry bottlers; use of Royal Crown bottle crowns by Nehi, which indicated that the product was bottled by the Royal Crown Cola Company of Chicago; and Nehi's failure to mark its delivery trucks with Canada Dry decals. Claiming that Nehi's "admitted or undisputed performance deficiencies" were in violation of the franchise agreement, Canada Dry asserts that any one of Nehi's breaches was sufficient grounds to justify termination of the agreement. Canada Dry claims that these deficiencies, as a whole, indicate that Nehi both "repudiated" the franchise agreement and, indeed, never intended to comply with it.

Nehi responds with an extensive series of citations to the record demonstrating conflicting testimony or evidence introduced at

---

2. *Huff v. Travelers Indemnity Co.,* 266 Ind. 414, 421, 363 N.E.2d 985, 990 (1977).

trial on each point. Further, Nehi asserts that the jury could have found any or all of the breaches enumerated by Canada Dry to have been immaterial and thus not sufficient justification for terminating the entire agreement.

We conclude after reviewing the evidence that there was sufficient dispute concerning each of the asserted breaches of the franchise agreement that a jury could have reasonably concluded that these alleged breaches were not material and did not justify termination of the franchise agreement. The materiality of a contractual breach is a question of fact reserved for the jury. *Sahadi v. Continental Illinois National Bank and Trust Co. of Chicago*, 706 F.2d 193, 196 (7th Cir.1983); *Hensley v. E.R. Carpenter Co.*, 633 F.2d 1106, 1110 (5th Cir.1980); E. Farnsworth, Contracts, § 8.16 (1982). Magistrate Lee properly instructed the jury as to materiality. Instruction No. 18 stated that "once one party commits a material breach of an agreement, the other party may be excused from any further obligations under it." Instruction No. 19 explained the factors which the jury should consider in determining the materiality of a breach.[3] We reject Canada Dry's argument that we should find that certain of the breaches were material as a matter of law. We think that there was enough dispute as to these matters that the issues both of the occurrence of a breach and of its significance were properly left to the jury. The jury apparently decided that the various breaches alleged to have occurred either did not actually occur or were not sufficiently material to justify termination of the entire agreement. Our independent review of the record has convinced us that there was sufficient evidence to support these findings of the jury which we therefore approve.

**B. Operations In The Lafayette And Galveston Territories**

Canada Dry also argues that Nehi's continued sales in the Lafayette and Galveston territories, after its authority to sell in these areas had been withdrawn, constituted sufficient cause to terminate the franchise agreement.[4] Canada Dry contends that Nehi's rights to the territory had expired since Nehi neither exercised its option to extend its right to the territories (as required by the agreement to be given in writing by December 15, 1978) nor indicated to Canada Dry its intent to exercise its option. Nehi responds by arguing that Canada Dry had waived the requirement that Nehi formally exercise the option by allowing Nehi's marketing activity to continue without restriction until November 8, 1979, when Canada Dry retroactively granted a one year extension of the territorial rights to February 29, 1980. This November 8, 1979, date was almost a year after the date originally fixed for exercise of Nehi's option.

3. The instruction read:
A material breach of a contract is one which defeats the object or underlying purpose of the contract. In determining whether any breach by a party can constitute a material breach, you may consider the following circumstances: A, the extent to which the injured party will obtain the substantial benefit which he could reasonably have anticipated; B, the extent to which the injured party may be adequately compensated in damages for lack of complete performance; C, the extent to which the party failing to perform partly performed or made preparations for performance; D, the greater or less hardship on the party failing to perform in terminating the contract; E, the willful, negligent or innocent behavior of the party failing to perform; F, the greater or less certainty that the party failing to perform will perform the remainder of the contract; G, the extent to which the behavior of the party failing to perform or offered to perform comports with standards of good faith and fair dealing.
Tr. 3447–48. This was taken almost verbatim from Restatement (Second) of Contracts § 241 (1981), with the addition of test "G" considering "the extent to which the behavior of the party failing to perform or offered to perform comports with standards of good faith and fair dealing." The Restatement factors were cited with approval in *Churchwell v. Coller and Stoner Bldg. Co.*, 179 Ind.App. 357, 385 N.E.2d 492, 495 (1979).

4. The issue of Nehi's activities in the Lafayette and Galveston area was also one of the bases for Canada Dry's successful trademark infringement claim, which has not been appealed.

■ The issue whether Canada Dry waived the requirement that Nehi formally exercise its option to continue operations in Lafayette and Galveston is also a question of fact for the jury. *Phillips v. Green Street Corp.,* 143 Ind.App. 30, 38, 237 N.E.2d 590, 595 (1968). Magistrate Lee's instructions on the issue of waiver were to the effect that,

> Under the law in Indiana, a party can waive conditions of a contract by spoken words, conduct, or silence where the party is under a duty to speak. In these latter two situations, if the one party's conduct is such that the other party is misled into believing that the first party will not assert that right and in reliance on that belief materially changes his position, a waiver may occur.

■ This instruction correctly stated Indiana law that "mere silence, acquiescence or inactivity is not waiver unless there was a duty to speak or act," *American National Bank & Trust Co. v. St. Joseph Valley Bank,* 180 Ind.App. 546, 391 N.E.2d 685, 687 (1979). Indiana courts, however, have also recognized that "silence and acquiescence, when good faith requires a person to speak or act, are, in the matter of estoppel, equivalent to express affirmation." *Bahar v. Tadros,* 123 Ind.App. 570, 584, 112 N.E.2d 754, 760 (1953); *McNevin v. McNevin,* 444 N.E.2d 320, 328 (Ind.App. 1983). While speaking in the context of estoppel rather than waiver, the clear import of the court's statement in *Bahar* is that a jury may infer a duty to speak based on the parties' conduct of their contractual relations. Magistrate Lee's instruction properly permitted the jury to draw such an inference in this case.

■ Canada Dry objects to the waiver instruction on the ground that there is no evidence in the record that Nehi relied to its detriment upon Canada Dry's silence concerning Nehi's continued operations in Lafayette and Galveston after the prescribed exercise date of Nehi's option. We think Canada Dry's objection is unfounded. The jury could permissibly have inferred detrimental reliance from the evidence in the record about the resources which Nehi expended in developing these markets and from Canada Dry's exceptional delay of almost a year before indicating to Nehi its intent to terminate the territories. Hence, the jury had sufficient evidence to support its finding that Nehi's continued sales in these territories did not constitute cause for terminating the franchise agreement.

Magistrate Lee also instructed the jury that it could find a waiver of *any* of Nehi's breaches upon an oral assurance or promise by Canada Dry and a showing that Nehi changed its position in reliance upon such an assurance or promise. Court's Final Instruction No. 28. Canada Dry objected to this instruction, asserting that the contract contained an enforceable non-waiver clause, relying upon *Van Bibber v. Norris,* 419 N.E.2d 115, 121 (Ind.1981).

In *Van Bibber,* the Supreme Court of Indiana upheld a non-waiver clause in an installment contract, which provided that the waiver of a single default would not be deemed a waiver of subsequent defaults. 419 N.E.2d at 121. A non-waiver clause in an installment contract is, however, clearly more crucial to the entire contractual arrangement than was the non-waiver clause in the agreement between Canada Dry and Nehi. Without a valid non-waiver clause, the enforcement of an installment contract would become nearly impossible, since the certainty of regular payments, and, hence, the basis of the entire contractual relationship, would be undercut by a single incident over the course of payment. This is not the case here. In *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367 (7th Cir.1978), we stated, "[waiver] is basically an equitable principle used by courts to avoid harsh results when a party has conducted itself in such a way as to make those results unfair." 583 F.2d at 370. As applied in the present context, we do not believe, and we do not think Indiana law requires, that Canada Dry should be permitted to interpose "boilerplate" contract language in an attempt to obtain a result which the jury could, on the basis of the evidence present-

ed, reasonably have found to be unduly harsh to Nehi.

## C. Soft Drink Program

Canada Dry claims that it breached no contractual obligation to Nehi by refusing to implement with Nehi a program to market ginger ale as a soft drink. The franchise agreement states,

9. Nehi intends, subject to further review with Canada Dry, to introduce Ginger Ale as a soft drink in the Spring of 1978.

Canada Dry contends that the contract gave it discretion whether to implement the program. Thus, according to Canada Dry's reading of the contract, its only obligation was to exercise its discretion in good faith. Canada Dry asserts that it did so and accordingly concluded that Nehi's mixer sales performance was insufficient to justify commencement of a soft drink program. Canada Dry further argues that it presented a proposed soft drink program to Nehi, which Nehi rejected without making a counteroffer. This, according to Canada Dry, eliminated any responsibility on its part to begin a soft drink program.

Nehi argues that it consistently indicated to Canada Dry its willingness to begin such a program. Nehi introduced evidence of pre-contract negotiations between Richard Beeson, then President of Canada Dry, and Marvin Farber, President of Nehi, to demonstrate that participation by Nehi in a soft drink program was a significant consideration in the settlement of the then pending lawsuit between Nehi and Canada Dry.[5] Nehi argues that it would not have made a large investment in ginger ale glass had the right to participate in a soft drink program been illusory. Canada Dry vehemently objects to consideration of such evidence, arguing that it is barred by Indiana's parol evidence rule, citing *Lewis v. Burke,* 248 Ind. 297, 305, 226 N.E.2d 332, 337 (1967), and *Seastrom, Inc. v. Amick Construction Co.,* 161 Ind.App. 309, 312, 315 N.E.2d 431, 433 (1974). In *Lewis* and *Seastrom,* however, the written agreements involved were complete and unambiguous.

When a contract term is ambiguous, parol evidence is admissible for the purpose of interpreting the instrument but not to expand upon its terms. *Bandy v. Meyers,* 138 Ind.App. 202, 206, 213 N.E.2d 344, 346 (1966). This is, of course, an "overarching" principle of contract interpretation. *See* E. Farnsworth, CONTRACTS, § 7.10 (1982). Such permissible parol evidence includes statements made during pre-contract negotiations. *Id.*

The standard under Indiana law for determining ambiguity is whether reasonably intelligent persons, upon reading a contract, would honestly differ as to its meaning. *R.R. Donnelley & Sons, Co. v. Henry-Williams, Inc.,* 422 N.E.2d 353, 356 n. 3 (Ind.App.1981); *Boswell v. Lyon,* 401 N.E.2d 735, 740 (Ind.App.1980). The language, "Nehi intends, subject to further review with Canada Dry, to introduce ginger ale as a soft drink ..." easily falls within this definition of ambiguity. For example, a reasonably intelligent person could conclude that the statement means that a soft drink program would *definitely* be introduced and that the "review" would concern only the *particulars* of the plan. The phrase is equally susceptible to Canada Dry's interpretation.

Where ambiguity in a contract is to be resolved by such evidence as statements made in pre-contract negotiations, construction of the contract is a matter for the fact finder. *Donnelley,* 422 N.E.2d at 356. As such, evidence of pre-contract ne-

---

5. For example, Farber testified as follows with regard to an exchange of $30,250 worth of 12-ounce "Wink" bottles in Nehi's possession for a similar quantity of 16-ounce ginger ale glass, which would be used in a soft drink program:

Q: At any time during that conversation, did he (Beeson) offer to just pay you for the glass?
A: I don't think so. I think he wanted me to go into—no—*he wanted me to go into the 16-ounce ginger ale program.* [Emphasis supplied].
Tr. 1911.

gotiations and circumstances was properly submitted to the jury on the issue of Canada Dry's contractual obligation with respect to the soft drink program. We conclude that there was sufficient evidence in the record from which the jury could have resolved the ambiguity in Nehi's favor and inferred a breach on the part of Canada Dry. Canada Dry also objects to the instruction on this issue:

> If you find that any provision of the new agreement is ambiguous, then in arriving at the correct meaning you may construe the provision against the party that prepared the agreement.

Court's Final Instruction No. 25. Canada Dry asserts that "the question whether any particular contractual provision is 'ambiguous' is for the court to determine." Appellant's Brief at 20 n. 14.

 This objection is well-taken. In *Wilson v. Kauffman,* 156 Ind.App. 307, 296 N.E.2d 432 (1973), the Indiana Court of Appeals stated:

> Where a written contract is unambiguous the trial court should construe it and inform the jury as to its meaning. However, if it is ambiguous the particular ambiguity should be selected and submitted to the jury under proper instructions.

*Id.* at 314, 296 N.E.2d at 437; *see also Huntington Mutual Insurance Co. v. Walker,* 392 N.E.2d 1182, 1184 (Ind.App.1979). Nonetheless, given the evident ambiguity of the contested term and the otherwise appropriate content of the instruction, if Magistrate Lee erred, his error was harmless. FED.R.CIV.P. 61.

**D. Inconsistent Jury Verdicts**

Canada Dry finally contends that the jury's verdict in Canada Dry's favor on trademark infringement "demonstrates beyond any possible doubt that Canada Dry had good cause to terminate the agreement." This argument, however, involves an erroneous perspective on the case, for there are varying interpretations which would reconcile the jury's verdicts. For example, Canada Dry asserted several

trademark infringements over the term of the agreement. The jury might have found a trademark violation on the basis of a particular incident (such as finding a visible yeast contamination in Canada Dry products stored in Nehi's warehouse) but might not have found *that* incident to be sufficiently material to justify Canada Dry's termination of the entire agreement.

 In *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.,* 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798 (1962), the Supreme Court held that an appellate court, in order to avoid conflict with the 7th amendment's requirement that "no fact tried by a jury, shall be otherwise reexamined in any Court of the United States . . . ," must, if possible, search to reconcile inconsistent jury answers to special interrogatories. We therefore conclude that Canada Dry is not entitled as a matter of law to a denial of Nehi's claim for breach of contract on the basis of inconsistent jury verdicts. This result follows because there are reasonable views of the case by which any inconsistencies in the jury verdicts may be reconciled.

In sum, we reject Canada Dry's contention that the breach of contract verdict must be set aside and approve the jury's finding of liability on this claim.

### III

### Discrimination Under The Indiana Deceptive Franchise Practices Act

The Indiana Deceptive Franchise Practices Act provides that,

> It is unlawful for any franchisor who has entered into any franchise agreement with a franchisee who is a resident of Indiana to engage in any of these acts and practices in relation to the agreement:
>
> (5) discriminating unfairly among its franchisees, or unreasonably failing or refusing to comply with any terms of a franchise agreement . . .

IND.CODE § 23–2–2.7–2(5).

The jury awarded Nehi $200,000 in compensatory damages on its claim that Canada

Dry unfairly discriminated against it by refusing to initiate a "soft drink program" for ginger ale and by terminating the agreement prematurely. On appeal, Nehi asserts that it established a *prima facie* case of discrimination, with a resulting shift in the burden of proof to Canada Dry to prove as an affirmative defense that there were legitimate nondiscriminatory reasons for its conduct.

First, with respect to the soft drink program, Nehi's "*prima facie* case" consists of the following: (1) Nehi was the only bottler out of a total of nine midwestern bottlers presented with a ginger ale soft drink program which was not given the opportunity to initiate the program; (2) the soft drink program was part of a broad based midwestern marketing effort; (3) all of Canada Dry's national advertisements were, at the time in question, geared to the promotion of ginger ale as a soft drink; and (4) Nehi was consistently ready, willing and able to initiate a soft drink program.

Second, with respect to the premature termination of the agreement, Nehi's "*prima facie* case" of discrimination contains these elements: (1) to the best of any witness' knowledge, Canada Dry had never before terminated a bottler; (2) the quality of Nehi's Canada Dry products was allegedly no worse than those of other midwestern Canada Dry bottlers, of which none was terminated; (3) although Nehi failed to meet sales goals contained in the agreement, such failure had never led Canada Dry to terminate any other bottlers; and finally (4) in relative terms, Nehi's sales of Canada Dry products were rising faster than the national average and the average of midwestern Canada Dry bottlers at the time Canada Dry terminated the agreement.

We conclude, however, that Nehi failed to introduce sufficient evidence for the jury to find that Nehi established a *prima facie* case of discrimination. Discrimination among franchisees means that as between two or more similarly situated franchisees, and under similar financial and marketing conditions, a franchisor engaged in less favorable treatment toward the discriminatee than toward other franchisees. Thus, proof of "discrimination" requires a showing of arbitrary disparate treatment among similarly situated individuals or entities. This principle is supported by the very authorities which Nehi itself has cited in favor of its position.

Thus, in *Swayne & Hoyt, Ltd. v. United States*, 300 U.S. 297, 57 S.Ct. 478, 81 L.Ed. 659 (1937), the Supreme Court held that appellees established a *prima facie* case of discrimination with respect to the ocean freight rates charged by appellants. The court stated, "[t]he differential between appellants' rates on commodities transported under contract and the rates on the same commodities for non-contract shippers was *prima facie discriminatory since the two rates were charged for identical services and facilities*," 300 U.S. at 303, 57 S.Ct. at 480 (emphasis supplied). Similarly, in *Atchison, Topeka and Santa Fe Ry. v. United States*, 218 F.Supp. 359 (N.D.Ill.1963), the district court noted, "both the Interstate Commerce Commission and the federal courts have ruled that undue prejudice or preference [in freight rates] does not exist unless the transportation conditions with regard to the prejudiced and preferred points are substantially similar." 218 F.Supp. at 366. Finally, in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court held that one element of a plaintiff's *prima facie* case of class-based discrimination in employment is that the plaintiff is *qualified* for the job (and, hence, similar in this respect to other applicants). Thus, one who alleges employment discrimination in violation of Title VII must show substantial similarity to other applicants except for race, sex, religion or national origin. 411 U.S. 802, 93 S.Ct. 1824.

Given the necessity of showing similarity of situation in connection with a claim of discriminatory treatment—whether involving shippers, job applicants or franchisees— Nehi's discrimination claim must fail as a matter of law. Nehi introduced no evidence of more favorable treatment of *simi-*

lar bottlers under *similar* marketing conditions either as to the soft drink program or as to termination of the franchise agreement. For example, Nehi did not show whether it was as qualified to enter the soft drink program as the eight bottlers who were offered such a program; nor did it demonstrate that it was more qualified than bottlers who were also not offered the program, of which Canada Dry asserts there were at least fifteen.

As to termination, Nehi's only evidence of discrimination was that no bottler had ever been terminated by Canada Dry before, although some bottlers exhibited *some* of the deficiencies which formed the basis for Nehi's termination by Canada Dry. No evidence was submitted indicating that any bottler had acted comparably to Nehi with respect to the full range of Nehi's deficiencies. The fact that some bottlers were deficient in only some of the ways in which Nehi was deficient, but were not terminated (*e.g.,* other bottling facilities reported yeast contamination in their plants), is an inadequate basis for comparison between Nehi and other bottlers. Therefore, such comparisons provide insufficient evidence from which a reasonable jury could conclude, *prima facie,* that Canada Dry unfairly discriminated against Nehi. A demonstration of comparability in a termination context will no doubt often be difficult, but we think this is no reason for sustaining discrimination claims where there is an inadequate basis of comparison.

Absent an adequate showing of comparability between the alleged deficiencies of Nehi and the deficiencies of other bottlers, it was error to submit Nehi's claim under IND.CODE § 23–2–2.7–2(5) to the jury. A verdict should have been directed or a judgment notwithstanding the verdict granted to Canada Dry with respect to this claim.[6]

6. Future courts will have to decide whether, under the Indiana Deceptive Franchise Practices Act, once a *prima facie* case is established, the burden of persuasion shifts to the defendant. *See generally Brattleboro Auto Sales, Inc. v. Subaru of New England, Inc.,* 633

## IV

## Compensatory Damages

Canada Dry argues that it is entitled to a new trial on the issue of compensatory damages for breach of contract. The defendant contends that no competent evidence was presented to support Nehi's damage claims regarding the ginger ale soft drink program and that the evidence concerning damages resulting from the termination of the franchise agreement was improperly admitted, erroneous and prejudicial. Nonetheless, we conclude that a new trial on the issue of compensatory damages is not warranted.

The jury awarded Nehi compensatory damages in the amount of $100,609.01 for Canada Dry's wrongful termination of the franchise and non-implementation of the soft drink program. In support of its claimed damages on its wrongful termination claim, Nehi introduced shortly before noon on the last day of the sixteen day trial (and without prior notice) a chart (exhibit M [10]) showing its claimed lost profits over a period of several years. The total was represented to be $319,239. One of the key numbers in Nehi's calculations was a figure of $1.50 net profit per case that it derived by subtracting average per case expenses, amounting to $0.51, from the average per case gross margin of $2.01. The $1.50 net profit per case figure was also presented to the jury in another chart (exhibit N [10]). Canada Dry argues that the average per case expense was erroneously computed by Nehi and, instead of $0.51 per case, the actual expense should have been shown as approximately $1.63 per case. This would have resulted in Nehi showing a per case average profit of $0.38 instead of $1.50. Canada Dry contends that therefore Nehi's claimed total profit loss of $319,239, which it presented to the jury in exhibit M [10], should have been reduced to less than $81,-000.

F.2d 649, 653 (2d Cir.1980) (Vermont Automobile Dealers "Bill of Rights"); *Weisenburger v. Amoco Oil Co.,* 534 F.Supp. 673, 676 n. 5 (D.N.D.1982) (Petroleum Marketing Practices Act, 15 U.S.C. § 2801, *et seq.* ).

Canada Dry argues first that the Magistrate erred in admitting the damage summary charts before Canada Dry had received all the necessary workpapers and records underlying the summaries. This error, Canada Dry maintains, deprived it of "any fair opportunity timely to discover the egregious error...." Canada Dry argues further that the computational error was so gross and prejudicial that a new trial on damages must be held.

Even assuming that serious computational errors are contained in the charts, we think it inappropriate in the case before us to order a new trial. We agree with Canada Dry that Rule 1006 of the Federal Rules of Evidence requires that a party against whom a summary exhibit is sought to be admitted must be accorded adequate time to examine the documents underlying the summary in order to check its accuracy. 5 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 1006[01] at 1006–4 (1982). Accordingly, if Canada Dry, once it learned of the damages charts, had asked for a recess to check the underlying calculations, a refusal by the trial court to allow Canada Dry sufficient time would presumably have been an abuse of discretion. This, however, did not occur. Canada Dry never sought the opportunity during the trial to check the data, although it did ask for and receive at least the worksheets used by the chart's preparer. Canada Dry chose instead to challenge the charts on other grounds during the trial. Canada Dry selected its own trial strategy and failed to seek an adequate recess to analyze the summary fully. It was this choice which "deprived" it of the opportunity to discover before the end of the trial that the summary charts on damages were seriously flawed.[7]

In our trial system we rely primarily on the litigants to sift and winnow, through the adversarial process, the evidence which is presented to the jury. At least where litigants are represented by experienced trial counsel and the error is one that could and should have been timely discovered, we cannot ordinarily allow errors discovered only after trial to invalidate the trial results. A contrary decision would reduce the incentive to test vigorously opposing evidence at trial. Instead there would be a new incentive to search transcripts *after* an unfavorable verdict in an effort to find a computational error of sufficient magnitude to mandate a new trial. Given the consequences of such a rearrangement of incentives to judicial economy, we think Canada Dry must be held to have assumed the risk of computational errors,[8] when it failed to seek an adequate continuance to scrutinize the summary exhibits, which were introduced without prior notice. In addition, Nehi argues that the *net* profit figure was not crucial since, if overhead remained constant, loss would be measured by *gross* profit. We need not definitively address this argument.

By allowing a jury verdict apparently based in part on an egregious computational error to stand, we recognize that we may be sanctioning "error" in an ultimate sense. We think, however, that this is a lesser evil under the present circumstances than relieving the parties of their obligation to challenge vigorously the evidence at the time it is presented at trial.

Canada Dry also disputes the sufficiency of the damages evidence presented by Nehi on its breach of contract claim for Canada Dry's failure to implement the ginger ale soft drink program. The evidence which Nehi offered consisted of a chart based on a

---

**7.** Canada Dry did not request a recess to examine the worksheets, place the worksheets in evidence, request any other records, or ask to place Nehi's legal assistant (who prepared the exhibits) on the witness stand. Appellee's Brief at 50.

**8.** In reaching our conclusion, we must also criticize Nehi's conduct in failing to include these charts on its list of exhibits submitted pursuant to the court's pretrial disclosure order, failing to give Canada Dry reasonable notice of its intention to use such charts and waiting until the last day of a 16 day trial to introduce such complex evidence. We feel, nonetheless, that the final error (and the "last clear chance to avoid" the error) was Canada Dry's failure to make a timely and appropriate objection and to request time to study the figures.

study prepared by Canada Dry in 1978 showing sales and profit figures projected for 1978 to 1982 if Canada Dry were to implement the program. Canada Dry objects to the use of these projected figures in place of post-1978 figures reflecting Nehi's actual business experience.

While there may be weaknesses in the use of this type of evidence, it is not incompetent evidence which would require overturning the jury award of compensatory damages. The weaknesses which Canada Dry points out go to the weight that should be accorded the evidence and not to its competence or admissibility. The accuracy and reliability of the data on which the chart was based were more properly the subject of Canada Dry's argument to the jury. As long as the jury had this evidence—whatever its weaknesses—on which to base its calculations, we believe that there was an adequate, even if minimal, basis in the evidence for the jury award.

V

Punitive Damages

The jury awarded punitive damages of $300,000 to Nehi on its breach of contract claim. Canada Dry argues that the issue of punitive damages should not have been submitted to the jury and that it was entitled to judgment as a matter of law on this issue.

Under Indiana law, punitive damages are available in contract actions, even though the facts are not sufficient for an independent tort action, "when it appears from the evidence as a whole that a serious wrong, tortious in nature, has been committed.... Only when these factors coalesce, will the independent tort requirement be abrogated, and the allowance of punitive damages be sustained." *Vernon Fire & Casualty Insurance Co. v. A.W. Sharp,* 264 Ind. 599, 608, 349 N.E.2d 173, 180 (1976). However, for punitive damages to be awarded in a contract action, *"[i]t must also appear that the public interest will be served by the deterrent effect punitive damages will have upon future conduct of*

*the wrongdoer and parties similarly situated." Id.* (emphasis in original); *see also Travelers Indemnity Co. v. Armstrong,* 442 N.E.2d 349, 358 (Ind.1982).

Punitive damages have been awarded in cases involving intentional, wanton and oppressive conduct accompanied by infliction of economic duress, *Vernon Fire,* 264 Ind. at 616, 349 N.E.2d at 185 (insurer refused to pay claimant in order to force a third party settlement); deception, malice, fraud, gross negligence and oppressive conduct, *Hibschman Pontiac, Inc. v. Batchelor,* 266 Ind. 310, 314–15, 362 N.E.2d 845, 848 (1977) (auto dealer avoided repairs until warranty period expired); and consumer fraud, oppressive conduct and threats of forfeiture of a down payment, *Jones v. Abriani,* 169 Ind.App. 556, 576–80, 350 N.E.2d 635, 648–50 (1976) (seller refused to return deposit upon buyer's rejection of defective mobile home). In *Jos. Schlitz Brewing Co. v. Central Beverage Co.,* 172 Ind.App. 81, 359 N.E.2d 566 (1977), the court upheld an award of punitive damages against a brewer which had wrongfully terminated a beer wholesaler in violation of a state statute which regulated liquor distributorships. In affirming the punitive damages award, the court found that Schlitz had engaged in tortious and oppressive conduct and had acted in bad faith, and, finally, that the termination was not in the public interest. Schlitz' violation of the Indiana statute, in contravention of a clearly stated public policy, serves to distinguish this case from Canada Dry's actions, which may have involved a breach of contract but did not violate a state statute or public policy.

The court in *Schlitz* stated that an award of punitive damages is improper when a contracting party, without aggravating circumstances, elects for whatever reason not to perform his contractual duties.... The reason for the rule is that the injured party in most cases can be made whole by an award of compensatory damages, and the public policy of our State is not offended by the breach of a private contract.

*Id.* at 102, 359 N.E.2d at 579–80. Further, punitive damages are not allowable upon evidence that is merely consistent with a hypothesis of tortious behavior but rather "some evidence should be required that is inconsistent with the hypothesis that the tortious conduct was the result of a mistake of law or fact, honest error of judgment, over-zealousness, mere negligence or other such noniniquitous human failing." *Travelers Indemnity,* 442 N.E.2d at 362.

The Indiana Supreme Court's recent opinion in *Travelers Indemnity* (decided after the trial in this case) changed Indiana law so that punitive damages must be proven by the stricter evidentiary requirement of "clear and convincing evidence." 442 N.E.2d at 360. The court stated that it was necessary to adopt for punitive damages "an evidentiary standard not heretofore required, lest the public policy favoring such awards be subverted." *Id.* The only instruction the jury received in the present case, with respect to the burden of proof, incorporated the "preponderance of the evidence" standard. The jury was not instructed that it could assess punitive damages *only* on the basis of "clear and convinc-

ing evidence." In view of *Travelers Indemnity,* the jury here was incorrectly instructed. Further, the Indiana Appellate Court very recently concluded that "it is appropriate to apply *Travelers* to punitive damages award cases still on direct appeal" at the time the Indiana Supreme Court in *Travelers* changed its evidentiary rule. *Farm Bureau Mutual Insurance Co. v. Dercach,* 450 N.E.2d 537, 541 (Ind.App.1983).[9]

These several factors must be considered together. First, the stricter standard requiring "clear and convincing evidence" must now be applied to this punitive damages award. Second, since Canada Dry's breach of contract did not apparently involve tortious, fraudulent or oppressive conduct,[10] it cannot easily be said to have been contrary to public policy. Further, this transaction involved two presumably sophisticated parties, not one experienced party attempting to deceive or defraud a neophyte. Exploitation of the consumer—not present here—was involved in several of the Indiana cases in which punitive damages awards have been affirmed. Finally, since we have found it necessary to reverse the jury verdict for Nehi on its claim of

---

9. We reject Nehi's argument that Canada Dry waived its right to object now to this instruction. Canada Dry both objected to giving the jury any instruction on punitive damages and also objected to the particular instruction given. We do not think that Canada Dry should be required to anticipate a change in the law and object specifically on the ground that the burden of proof was misstated in order to preserve its right to argue the point now. *See Dercach,* 450 N.E.2d at 541.

10. Nehi argues that

[a]s early as April, 1979, Canada Dry began efforts to generate reasons to terminate the contract rather than to perform it. The express purpose for Green's [Canada Dry's regional director] survey of the Lafayette market was to generate "backup" data to support a termination of the Lafayette and Galveston territories.... [Canada Dry later] sought Nehi's agreement to a waiver of Nehi's rights in the territories. When Nehi refused to sign, Canada Dry cited that refusal as a basis for terminating Indianapolis as well.

Appellee's Brief at 29. Nehi contends that this and other conduct amounted to malice and oppression on the part of Canada Dry. We believe, however, that there was conflicting and

disputed evidence of a sharp and broadly ramifying commercial dispute leading to litigation. The record does not contain the sort of clear and convincing evidence needed to support punitive damages.

Nehi's contention that Canada Dry never intended to fulfill its contract with Nehi, even if proven, also does not establish an element of fraud as a basis for an award of punitive damages. Appellee's Brief at 31. This court, quoting the Indiana Supreme Court, has stated Indiana law as holding that

"actionable fraud cannot be predicated upon a promise to do a thing in the future although there may be no intention of fulfilling the promise."

*Grande v. General Motors Corp.,* 444 F.2d 1022, 1025 (7th Cir.1971) (quoting *Sachs v. Blewett,* 206 Ind. 151, 156, 185 N.E. 856, 858 (1933); *accord Royal Business Machines, Inc. v. Lorraine Corp.,* 633 F.2d 34, 45 (7th Cir.1980) ("a fraud action [cannot] be predicated upon ... promises to perform in the future"). Therefore, there would appear to be no clear basis for awarding punitive damages to Nehi, even if Canada Dry did not in fact intend wholeheartedly to fulfill its contract.

discrimination among franchisees, Canada Dry's breach cannot be said to have violated public policy on that account. The *Schlitz* case involved violation of a state statute prohibiting the very conduct in which Schlitz had engaged. The apparent lack of clear and convincing evidence that Canada Dry acted against public policy indicates that Nehi has not satisfied the second prong of the *Vernon Fire* test for the award of punitive damages in breach of contract cases, namely, that the public interest would be served by the deterrent effect of punitive damages on the future conduct of parties in similar situations. 264 Ind. at 608, 349 N.E.2d at 180.

■ Under the theory of contract damages, a party may refuse to fulfill its obligations and be liable only for the damages which the other party suffers as a result of the breach.

> [O]ur system of contract remedies rejects, for the most part, compulsion of the promisor as a goal. It does not impose criminal penalties on one who refuses to perform his promise, nor does it generally require him to pay punitive damages. Our system of contract remedies is not directed at *compulsion* of *promisors* to *prevent* breach; it is aimed, instead, at *relief* to *promisees* to *redress* breach.
>
> \* \* \* \* \* \*
>
> Furthermore, no matter how reprehensible the breach, damages that are punitive, in the sense of being in excess of those required to compensate the injured party for his lost expectation, are not ordinarily awarded for breach of contract. It is a fundamental tenet of the law of contract remedies that, regardless of the character of the breach, an injured party should not be put in a better position than he would have been in had the contract been performed.

E. Farnsworth, CONTRACTS, §§ 12.1; 12.8 (1982) (emphasis in original) (citations omitted).

■ An award of punitive damages is therefore allowed under Indiana law only when some element of tortious conduct is found or some aspect of public policy is offended. While we are reluctant to take this matter from the purview of the jury, we must find that, as a matter of law, Nehi could not establish, under the "clear and convincing evidence" standard, either tortious conduct or a violation of public policy on the part of Canada Dry. Under all the circumstances, we hold that Nehi is not entitled to punitive damages as a matter of law.

## VI

### Impropriety Of Closing Argument

■ Finally, Canada Dry argues that the trial court committed reversible error in failing to take appropriate action to remedy the effects of remarks made by Nehi's counsel during closing argument. These remarks included vouching for the honesty and credibility of Nehi's president, Mr. Farber, on the basis of his personal friendship with counsel, and counsel's expression of his own conviction of and belief in the correctness of Nehi's case. In closing argument, Nehi's counsel told the jury:

> Marvin Farber is an honest person. Marvin Farber, indeed, has become a good friend of mine....
>
> The fact is, I'm proud to have had the opportunity to represent Nehi in this courtroom, and to have known Marvin Farber personally throughout this period of time. I'm convinced that both Marvin Farber and Nehi are the persons who have been hurt badly by conduct on the part of Canada Dry that is without justification under any circumstances.

Tr. 3380–81.

Such remarks are clearly improper. The ABA Code of Professional Responsibility states:

> (C) In appearing in his professional capacity before a tribunal, a lawyer shall not: (4) Assert his personal opinions as to the justness of a cause, as to the credibility of a witness, as to the culpability of a civil litigant...

Disciplinary Rule 7–106(C)(4).

■ Despite the impropriety of these remarks, we decline to hold that this is

reversible error. The improper remarks occupied about one minute in a ninety minute closing statement. It is within the trial court's discretion to determine whether counsel's remarks require admonition to the jury, and that discretion will only be upset for clear abuse. *Childers v. United States,* 542 F.2d 1243, 1245–46 (4th Cir.1976); *De-Young v. Norwalk Truck Lines, Inc.,* 362 F.2d 146, 148 (7th Cir.1966); *Ward v. H.B. Zachry Construction Co.,* 570 F.2d 892, 895 (10th Cir.1978). In *Ward,* the court said that "[b]ecause the trial judge is in the best position to determine the effect that arguments of counsel have upon the jury, considerable discretion is given to the trial judge in exercising supervision over arguments of counsel." Under these particular circumstances, the length of the closing argument and the brevity of the improper remarks and the trial judge's reminder to the jury that statements of counsel are not evidence (Tr. 3435–36), we find that these remarks, while improper and erroneous, were harmless error, and that the trial court did not abuse its discretion in refusing to grant a new trial on this basis.

Affirmed in part and reversed in part, each party to bear its own costs.