**PEPSI-COLA COMPANY, Plaintiff,**

v.

**STEAK 'N SHAKE, INC., Defendant.**

**No. IP 95–580 C B/S.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Oct. 3, 1997.

Stephen K. Smith, Barnes & Thornburg, Indianapolis, IN, for Plaintiff.

James R. Fisher, Ice, Miller, Donadio & Ryan, Indianapolis, IN, Gregory Garrison, Garrison & Keifer, Indianapolis, IN, for Defendant.

### ENTRY DENYING PARTIES' MOTIONS FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

This case comes before the Court on a motion for partial summary judgment by Plaintiff, Pepsi–Cola Company ("Pepsi"), requesting that the Court dismiss Defendant's counterclaim and a motion for summary judgment by Defendant, Steak 'n Shake, Inc. ("Steak 'n Shake"), requesting that the Court grant its counterclaim and dismiss Pepsi's claim. The parties' respective motions are DENIED.

### BACKGROUND

This case involves a contract dispute. During the months of April and May, 1991 Steak 'n Shake and Pepsi negotiated a contract whereby Steak 'n Shake would replace its then current drink product (King Cola) with Pepsi fountain soft drink products in its restaurants. Based upon the April negotiations, Pepsi prepared and forwarded to Steak 'n Shake a preliminary draft of a proposed agreement between the parties. Plaintiff's Exhibit E and Kelley Depo. at 158–60. Along with the proposal, Pepsi's Vice President of On–Premise Sales, Vince Gennaro ("Gennaro"), sent an unsigned letter ("the Letter") that stated:

We are very excited about our new long–term relationship with Steak 'n Shake. In support of this partnership, we would like to bring to Steak 'n Shake innovative marketing programs to advance both your restaurant business and our soft drink business. We see the opportunity to utilize Steak 'n Shake as a "learning laboratory" for new marketing ideas. We will develop programs consistent with your marketing strategies to enhance your image, as well as realize the full potential of soft drinks. We view this marketing partnership to include in–restaurant merchandising, Pepsi–identified cups, cup programs and special events.

We will also use Steak 'n Shake as a showcase for Pepsi marketing in the market areas it operates as well as provide Steak 'n Shake the strength of our first–class marketing efforts.

I am confident that our collective creativity, commitment and aggressiveness will allow us to set a new standard for soft drink's role in restaurant profitability. Thanks for having the belief in us to chose Pepsi as your partner.

Plaintiff's Exhibit M.

The parties exchanged various drafts of the proposed agreement which were revised

by both parties. Kelley Depo. at 174–77; Witherspoon Depo. at 242. On May 24, 1991, the parties executed two written agreements, the Pepsi Promise and the Service & Sales contract (hereafter collectively referred to as "the Contract"). Plaintiff's Exhibits J and K. The Contract expressly states that it supersedes all prior agreements and contains the entire understanding of the parties. In addition, the Contract provides that modifications must be executed in writing, signed by both parties. The Contract also contains a marketing provision which provides:

> The Customer [Steak 'n Shake] shall participate in at least one Pepsi–Cola approved marketing program per calendar year for each year of this Agreement. The program shall be for the primary benefit of the Customer's system, and the Customer shall use a portion of the Flex Funds payable to the Customer under this Agreement as the Customer decides to help offset the advertising and promotion costs of such programs, limited to the equivalent of $.30 of the $.65 per gallon Flex Fund payments.

Plaintiff's Exhibit J.

Shortly after the parties executed the Contract, Steak 'n Shake sent Pepsi a letter stating, in relevant part:

> We ask that you give us the original signed letter from Mr. Vince Gennaro, Vice President On–Premise Sales, [the Letter] as we had previously agreed and we also ask that it be made part of this contract as we previously agreed.

Plaintiff's Exhibit L. In response, Pepsi sent Steak 'n Shake a signed copy of the Letter. Kelley Depo. at 277–79. Subsequently, on June 19, 199 1, Steak 'n Shake sent Pepsi another letter stating, in relevant part:

> As discussed today by telephone, we have agreed that the enclosed letter dated June 17, 1991 [the Letter] ... relating to the marketing philosophy of Pepsi–Cola in its new long–term relationship with Steak 'n Shake, Inc., is hereby incorporated in the subject Supply Agreement between our companies as a contractual commitment of Pepsi–Cola as is fully set out therein.
>
> If the above correctly sets forth our understanding, please sign at the indicated place below and return for my file.

Plaintiff's Exhibit N. Pepsi did not respond in writing. Thereafter, on June 10, 1991, Steak 'n Shake again wrote Pepsi stating:

> We have asked you to incorporate [the Letter] into the documents which we signed on May 24th but you have not agreed to do so.
>
> If you do not make [the Letter] a part of our original agreement as requested we still assume that you stand behind it and it will be interpreted as part of our agreement if we are to continue with our installations. If we do not hear from you to the contrary on these understandings we will proceed with the installations.

Plaintiff's Exhibit O. Pepsi again did not respond in writing. The parties continued operating under the Contract for approximately three years until on August 23, 1994 Steak 'n Shake notified Pepsi of its intention to terminate the Contract. Complaint ¶ 9; Amended Answer ¶ 5. Pepsi subsequently brought this suit against Steak 'n Shake alleging breach of Contract through an improper termination of the Contract. Steak 'n Shake responded by alleging that Pepsi breached the Contract first and thereby provided Steak 'n Shake "cause" to terminate the Contract and prompted their filing a counterclaim against Pepsi on the grounds that Pepsi wrongfully breached the contract.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Pro. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a jury to return a verdict in favor of the non-moving party on the particular issue. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Methodist Med. Ctr. v. American Med. Sec., Inc.,* 38 F.3d 316, 319 (7th Cir.1994).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non–movants to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Celotex* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. In resolving a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non–movants. *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 366 (7th Cir. 1997); *Spraying Sys. Co. v. Delavan. Inc.,* 975 F.2d 387, 392 (7th Cir.1992). However, we must not "ignore facts in the record merely because they are unfavorable.... [A non–movant] gets the benefit of the doubt only if the record contains competent evidence on both sides of a factual question." *Patel,* 105 F.3d at 366. Thus, if genuine doubts remain, and a reasonable fact–finder could find for the party opposing the motion, summary judgment is inappropriate. *Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989).

■ Nevertheless, only issues of fact that could affect the outcome of a case are "genuine" such that they may save a case from summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Tolle · v. Carroll Touch, Inc.,* 23 F.3d 174, 178 (7th Cir.1994). Thus, if it is clear that a plaintiff will be unable to satisfy the legal obligations required of him to establish his case, summary judgment is not only appropriate, but also required. *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *Herman v. City of Chicago,* 870 F.2d 400, 404 (7th Cir.1989). "Summary judgment is appropriate in a matter of contract interpretation where no issues of fact exist because the language of the contract is unambiguous." *Grundstad v. Ritt et al.,* 106 F.3d 201, 205 (7th Cir.1997).

## DISCUSSION

Pepsi seeks summary judgment on Steak 'n Shake's counterclaim that Pepsi breached the Contract. Steak 'n Shake also moves for summary judgment on its counterclaim, and additionally, seeks summary judgment on Pepsi's breach of contract claim, raising three contentions: (1) Steak 'n Shake breached for cause, (2) the Contract violated the Statute of Frauds, and (3) Pepsi's requested damages are not legally cognizable.[1]

In fact, all the motions distill to these three issues: whether Pepsi breached the Contract, whether the Contract violated the Statute of Frauds, and whether Pepsi's requested damages are legally cognizable. Steak 'n Shake alleges that Pepsi violated the Contract's marketing obligations, contending that Pepsi was contractually obligated to conduct marketing programs targeting Steak 'n Shake's primary customer base, to wit, baby–boomers, and that Pepsi failed to fulfill that obligation. Steak 'n Shake invokes the contents of the Letter which it contends obligate Pepsi to conduct marketing programs consistent with Steak 'n Shake's marketing strategy to target the baby–boomer population.

Pepsi rejoins that the Letter is not part of the Contract and is inadmissible in the Court's determination of the Contract's meaning. Alternatively, Pepsi contends that, even if the Letter is deemed a part of the Contract or evidence of the Contract's meaning, Steak 'n Shake has failed to establish that Pepsi breached the marketing obligations contained in the Letter.

### ISSUE I: WAS THE "LETTER" A PART OF THE CONTRACT?

■ Steak 'n Shake maintains that the Contract included the Letter. The Contract involves the sale of goods and thus is governed by Indiana's Uniform Commercial Code (U.C.C.), codified at Ind.Code §§ 26–1–1–101, *et seq.* Under the U.C.C., "[a]ny con-

---

1. Pepsi moves to strike Steak 'n Shake's reply brief for exceeding the 20 page limit on reply briefs. *See* Local Rule 7.1(b). This limit may be exceeded only with the Court's permission. *Id.* Steak 'n Shake submitted a 34 page reply brief *without* the Court's permission. The page limitations set forth in the Local Rules are designed to foster the efficient administration of our courts.

They are not suggestions or requests; they impose requirements for practicing before this Court. Pepsi's motion seeks to strike Steak 'n Shake's reply brief or, in the alternative, permission to file a surreply brief. While the Court will not strike Steak 'n Shake's reply brief, Pepsi's motion is granted in that Pepsi's 15–page surreply brief is accepted.

tract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties." 3 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 574, at 371 (1960). The parties may also agree, however, not to modify or rescind their deal except by a signed writing. IND. CODE § 26–1–2–209(2); *see* 3 L. CUNNINGHAM & A. JACOBSON, CORBIN ON CONTRACTS § 574A(A), at 491 (Supp.1997). The Pepsi and Steak 'n Shake contract contained such an agreement, reciting that "[t]his Agreement may be amended or modified only by written notice signed by each of the parties." Plaintiff's Exhibit J. The validity of this provision has not been challenged and is binding on the parties.

 "Modification requires the consent of both parties." *Burras v. Canal Constr. & Design Co.*, 470 N.E.2d 1362, 1366 (Ind.Ct. App.1984). A series of communications between the parties establishes that Pepsi did not expressly consent to the incorporation of the terms of the Letter into the Contract. Throughout their correspondence, Steak 'n Shake advanced its request that Pepsi consent to incorporate the Letter into the Contract, but the record is clear that Pepsi never assented to those requests.

Steak 'n Shake nevertheless argues that the following events establish that the Letter was incorporated into the Contract. In a letter dated June 5, 1991, Steak 'n Shake requested that Pepsi send "the original signed letter from Mr. Vince Gennaro, Vice President On–Premise Sales, [the Letter] as we had previously agreed and we also ask that it be made a part of this contract as we had previously agreed." Pepsi responded only by fulfilling the first request; it remitted a signed copy of Gennaro's original letter (the Letter). Pepsi did nothing to make the Letter part of the Contract. Nothing in the text of the Letter indicates that it was by its terms a modification of the Contract or that it was intended to become part of the Contract in any way. Nor did Steak 'n Shake indicate that, by sending the signed Letter, Pepsi was consenting to modify the Contract. Instead, the June 5th letter clearly contemplated that sending the signed Letter and agreeing to incorporate the Letter into the Contract were regarded as two different acts.

Despite Pepsi's refusals, Steak 'n Shake again attempted to obtain Pepsi's consent to incorporate the Letter in the Contract. On June 19, 1991 it sent a letter in which Steak 'n Shake sought once again Pepsi's consent to incorporate the Letter into the Contract. Pepsi did not respond to this request. In a July 10, 1991 letter to Pepsi, Steak 'n Shake acknowledges Pepsi's failure to consent to the requested modification, writing: "We have asked you to incorporate Mr. Gennaro's June 17th letter [the Letter] into the documents which we have signed on May 24.... You have not agreed to do so." Plaintiff's Exhibit O. The letter again requested that Pepsi consent to incorporating the Letter into the Contract, but Pepsi did nothing to effect a valid written modification of the Contract. Because the parties had negotiated and agreed that any modifications must be signed by both parties and in writing, we must conclude that the Contract was never modified to incorporate the terms of the Letter.

 Steak 'n Shake contends alternatively that, even if a valid modification was not executed, Pepsi nonetheless was bound by the marketing obligations set out in the Letter, based on the principle of waiver. Steak 'n Shake argues that Pepsi waived the right to require adherence to the formalities of the Contract by performing as though it were bound by the Letter's marketing obligations. Pepsi's act of sending the Letter, despite its non–responsiveness to the July 10th letter, caused Steak 'n Shake to rely on those representations by installing & distributing Pepsi products in its restaurants.

Steak 'n Shake's contention rests primarily on its July 10th letter wherein, in addition to acknowledging that Pepsi had not consented to modifying the Contract, it stated that "we still assume that you stand by [the Letter] and it will be interpreted as part of our agreement if we are to continue with our installations. If we do not hear from you to the contrary on these understandings we will proceed with the installations." Steak 'n Shake contends that, in the face of these statements, Pepsi's failure to respond constitutes a waiver of the contractual provision that any modifications be in accordance with

the formalities required by the Contract, i.e. signed by the parties and in writing. In essence, Steak 'n Shake contends that, since Pepsi did not respond to its request to modify the agreement, the agreement nonetheless is deemed modified. For what we believe to be obvious reasons, Steak 'n Shake's waiver argument fails.

■ Indiana Code § 26–1–2–209(4) controls our analysis of the issue of waiver, providing that "although an attempt at modification or rescission does not satisfy the requirements of subsection (2) and (3), it can operate as a waiver." However, an attempted modification will operate as a waiver only when there is reliance on the attempted modification. *Wisconsin Knife Works v. Nat'l Metal Crafters*, 781 F.2d 1280 (7th Cir.1986). Furthermore, the reliance must be *reasonable. American Suzuki Motor Corp. v. Bill Kummer. Inc*, 65 F.3d 1381, 1386 (7th Cir. 1995); *see* 3 L. CUNNINGHAM & A. JACOBSON, CORBIN ON CONTRACTS § 574A(D), at 492 (Supp.1997) (reasonableness requirement intended to apply to waiver under U.C.C. § 2–209(4); no good reason exists to protect unreasonable expectations).

We hold that even if Steak 'n Shake did rely on the Letter and Pepsi's non–reaction to Steak 'n Shake's follow–up letter of July 10th by installing and distributing Pepsi products, its reliance was clearly unreasonable. Pepsi's refusals to incorporate the Letter into the Contract was made clear on multiple occasions by its "loud silence," and there is no evidence that Pepsi ever changed that position. Steak 'n Shake was clearly on notice that Pepsi had not acted to incorporate the Letter, which fact Steak 'n Shake has specifically acknowledged. Steak 'n Shake must be deemed a sophisticated commercial enterprise, well able to enter into, to interpret and to abide by its contracts. It had to know during the time of these dealings between the parties that any modification of the Contract was required to be in writing and signed by both parties. Therefore, Steak 'n Shake's alleged reliance upon Pepsi's failure to give it an explicit "no" to Steak 'n Shake's requests that the Letter be incorporated into the Contract was unreasonable and thus insufficient to support a waiver. ·

■ In addition to the unreasonableness of this response by Steak 'n Shake, waiver is not imputable because it can only arise from a party's silence "where the party is under a duty to speak." *Canada Dry Corp. v. Nehi Beverage Co.. Inc. of Indianapolis*, 723 F.2d 512, 518 (7th Cir.1983). Steak 'n Shake's contention that Pepsi's silence in the response to its July 10th letter constitutes waiver fails to establish that Pepsi had a duty to speak in response to that letter. In fact, Pepsi's previous silence was consistently heard by Steak 'n Shake to mean "no," and Steak 'n Shake never explains why the July 10th letter is different or why specifically it triggers an affirmative duty to which Pepsi was obligated to respond. Establishing that Pepsi had such a duty to speak is an essential element of waiver, and Steak 'n Shake has failed satisfy that requirement.

Accordingly, in failing t'o establish that its reliance was reasonable, and in failing to establish the essential elements of waiver, Steak 'n Shake's waiver contention is unsupportable. The Letter, therefore, cannot be deemed a part of the Contract.

### ISSUE II: IS THE "LETTER" ADMISSIBLE AS EVIDENCE OF CONTRACT'S MEANING?

Steak 'n Shake contends that even if the Letter is not deemed a part of the Contract, it is still admissible evidence of the Contract's meaning. Specifically, Steak 'n Shake maintains that the Letter should be admissible to explain allegedly ambiguous terms in the Contract's marketing provision. The U.C.C. provides guidelines for deciding whether extrinsic evidence ought to be consulted when attempting to determine the substance of a contract. One such guideline is the parol evidence rule, codified at Ind. Code § 26–1–2–202, providing that:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral

agreement but may be explained or supplemented:

(a) By course of dealing or usage of trade (IC 26–1–1–205) or by course of performance (IC 26–1–2–208); and

(b) By evidence of consistent additional terms, unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

■ This parol evidence rule governs whether the Letter in our case is admissible as evidence of the Contract's meaning. The rule prohibits evidence of a prior or separate agreement contradictory to the terms of the Contract. Pepsi argues that the Letter is such a prohibited prior agreement. Specifically, Pepsi contends that the Letter contradicts the marketing terms set forth in the Contract. Upon close examination, however, Pepsi actually contends that the Letter evidences additional marketing terms not in the Contract, and that in adding terms, it is contradictory to the marketing provision of the Contract. Adding terms to a contract, however, is different from adding contradictory terms. *See Travel Craft, Inc. v. Wilhelm Mende,* 552 N.E.2d 443, 445 (Ind.1990). Pepsi does not cite any language in the Letter that reasonably could be interpreted as contradictory of the marketing terms in the Contract. Because the Letter does not contradict the marketing provisions of the Contract, it is admissible as evidence of the meaning of the agreement between the parties.

We have held that the Letter is not properly to be considered a part of the Contract. The next issue is whether the Letter merely interprets or clarifies an ambiguity in the Contract's existing terms. Steak 'n Shake contends that the Letter clarifies the marketing terms in the contract. Pepsi responds that the Letter would add terms to the Contract when the Contract as written was intended to be the complete and exclusive statement of the parties' agreement.

■ While parol evidence may not be introduced to add to or contradict a fully integrated written agreement, evidence outside the document may be introduced to clarify or interpret an ambiguous term or phrase. *Travel Craft, Inc. v. Wilhelm*

*Mende, supra,* at 445; *see* also *Huffman v. Monroe County Community School Corp.,* 588 N.E.2d 1264, 1267 (Ind.1992) (parol evidence permitted to clarify terms of ambiguous release agreement); *Canada Dry Corp. v. Nehi Beverage Co., Inc. of Indianapolis,* 723 F.2d 512, 516 (7th Cir.1983) (parol evidence is admissible for the purpose of interpreting the instrument but not to expand upon its terms). A contract term is ambiguous if a reasonable person could find that it is susceptible to more than one interpretation. *Canada Dry Corp. v. Nehi Beverage Co.. Inc. of Indianapolis, supra,* at 519; *Piskorowski v. Shell Oil Co.,* 403 N.E.2d 838, 844 (Ind.Ct. App.1980).

■ The Contract's marketing provision provides that Steak 'n Shake must participate in at least one Pepsi–approved "marketing program" each year of the Agreement and that the programs be for the "primary benefit" of Steak 'n Shake. This provision generates more than one interpretation: the phrases "marketing program" and "for the primary benefit of the Customer" are particularly vague and ambiguous. "Marketing program" could refer to a number of different approaches. It could be a national advertising program, a regional advertising program, television advertising, billboard advertising, a promotional give away, a charity campaign, or a taste test promotion, just to name a few. *See Craig Food Indus. Inc. v. Weihing,* 746 P.2d 279 (Utah App.1987) (regarding a fast food franchising agreement, the court held ambiguous the nature of "a uniform program of promoting given products or services either through sales, discounts, specials or other promotional devices"). "For the primary benefit of the Customer" also gives rise to a variety of reasonable interpretations. It could be a campaign focused on a new customer base, a campaign focused on the current customer base, a campaign limited to customer's geographic locations, or a campaign simply emphasizing Steak 'n Shake rather than Pepsi. Ambiguous provisions such as these permit—perhaps even require—the admission of extrinsic evidence to determine the parties' in-

tent. *See OEC–Diasonics v. Major,* 622 N.E.2d 1025, 1030 n. 2 (Ind.Ct.App.1993)

The Indiana Supreme Court in *Travel Craft, Inc. v. Wilhelm Mende,* 552 N.E.2d 443 (Ind.1990), held that extrinsic evidence was admissible to explain ambiguous terms in a warranty. The case involved two, sophisticated business entities who had entered into a sales agreement which included a negotiated warranty. *Id.* at 444. The warranty provided that:

> Seller agrees for a period of three years from the date of delivery that product manufactured by it will be free under *normal use* from substantial *defects* in materials or workmanship.

*Id.* at 444 (emphasis added). Pursuant to IND. CODE § 26–1–2–202, the trial court excluded parol evidence and held that the terms were not ambiguous. In reversing, the Indiana Supreme Court held that the terms "normal use" and "defects" were ambiguous and that parol evidence was admissible to explain those terms. *Id.* It held that summary judgment had been inappropriate because the terms were subject to conflicting inferences. *Id.*

Similarly, in our case the terms "marketing program" and "for the primary benefit of the Customer" are ambiguous and could justify the admission of the Letter to determine the intent of the parties. The Letter arguably evidences what the parties intended by these phrases. For example, the Letter indicates that the phrase "a marketing program for the primary benefit of the Customer" may have referenced a merchandising program directed towards the baby–boomer demographic group. As demonstrated, the Letter can be interpreted to provide illumination to the Contract's ambiguous marketing terms and, accordingly, is admissible to assist the trier-of-fact in determining the Contract's meaning. *See Canada Dry Corp. v. Nehi Beverage Co.. Inc. of Indianapolis,* 723 F.2d 512, 519–20 (7th Cir.1983) ("if the written contract is ambiguous the particular ambiguity should be selected and submitted to the jury"); *Wilson v. Kauffman,* 156 Ind. App. 307, 296 N.E.2d 432, 437 (1973) (same). We hold, therefore, that Steak 'n Shake's motion for summary judgment on its counterclaim must be DENIED, and Steak 'n Shake's motion to dismiss Pepsi's breach of contract claim alleging that the breach was "with cause" must also be DENIED.

## ISSUE III: HAS STEAK 'N SHAKE PUT FORTH A PRIMA FACIE CLAIM THAT PEPSI VIOLATED THE CONTRACT?

Pepsi also moves for summary judgment on Steak 'n Shake's counterclaim contending that Steak 'n Shake has failed to put forth a prima facie case that Pepsi violated the Contract. Steak 'n Shake responds that it has met its burden by establishing a prima facie case of breach of contract against Pepsi. To establish a prima facie case, Steak 'n Shake must establish Pepsi's contractual obligations and show how Pepsi violated those obligations. *See Gould v. Lambert Excavating, Inc.* 870 F.2d 1214, 1218 (7th Cir. 1989). Pepsi rightfully does not dispute that Steak 'n Shake has fulfilled the first requirement, but maintains that the latter requirement is unmet.

Steak 'n Shake clearly has put forth a prima facie case that Pepsi violated its contractual obligations. Steak 'n Shake presented evidence indicating that a year after the execution of the Contract, Pepsi repudiated any obligation to provide Steak 'n Shake with a marketing program targeting the baby–boomer demographic group. *See* Gennaro Depo. Steak 'n Shake also presented evidence that Pepsi had not prepared a baby–boomer marketing program for Steak 'n Shake under the Contract. Steak 'n Shake cited the deposition testimony of Vince Gennaro, Pepsi's Vice President of On–Premise Sales, in which he states that he was unaware of any television advertisement prepared for the purpose of being presented to Steak 'n Shake as a marketing proposal or program. Gennaro Depo. at 103. Further, Gennaro could not recount any radio or print advertisements prepared for Steak 'n Shake focusing upon the baby–boomer demographic group. *Id.* at 104.

This evidence satisfies Steak 'n Shake's obligation to establish a prima facie case. Therefore, Pepsi's motion for summary judgment alleging that Steak 'n Shake failed to put forth a prima facie case of its breach of contract counterclaim is DENIED.

## ISSUE IV: DOES THE CONTRACT COMPLY WITH THE STATUTE OF FRAUDS?

Steak 'n Shake contends that the Contract fails to comply with the Statute of

Frauds because it lacks a quantity provision. Pepsi responds that, as a "requirements contract," the Contract does not have to specify a quantity. Further, Pepsi contends that the Contract's language, the industry custom, and the parties' course of performance all demonstrate that the Contract in fact was a "requirements contract."

The Uniform Commercial Code, as codified in the Indiana Code, sets forth the Statute of Frauds in § 2–201. It states in relevant part as follows:

> Except as otherwise provided in this section a contract for the sale of goods for the price of $500.00 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought by his authorized agent or broker. A writing is not sufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

IND. CODE § 26–1–1–201; U.C.C. § 2–201. The official comment to the U.C.C. clarifies that there are "three definite and invariable requirements" of a valid contract for the sale of goods. "First it must evidence a contract for the sale of goods; second, it must be 'signed'... and third, it must specify a quantity." U.C.C. § 2–201 Comment.

■■■ "A requirements contract is one under which the seller agrees to sell and the buyer to buy all of the goods of a particular kind that the buyer may require in its business." 1 J. WHITE AND R. SUMMERS, UNIFORM COMMERCIAL CODE § 3–9 at 154 (4th ed.1995). A writing, which contemplates a requirements contract, satisfies the Statute of Frauds even though the writing does not detail any specific quantities. *Zayre Corp. v. S.M. & R. Co., Inc.*, 882 F.2d 1145, 1154 (7th Cir.1989). However, "[w]hile the quantity term in requirements contracts need not be numerically stated, there must be some writing which indicates that the quantity to be delivered under the contract is a party's requirement or output." *Eastern Dental Corp. v. Isaac Masel Co., Inc.*, 502 F.Supp. 1354, 1364 (E.D.Pa.1980). A requirements contract is not an exception to the Statute of Frauds. *Medline Indus., Inc., v. Keilei Int'l, Inc.*, No. 89–C–4882, 1992 WL 133012, at *5 (N.D.Ill. May 29, 1992). Rather, "to satisfy § 2–201, the writing must indicate that the contract is one for requirements." *Zayre Corp. v. S.M. & R. Co., Inc., supra,* at 1155 (7th Cir.1989).

■■■ Steak 'n Shake contends that the Contract lacks any language indicating it is a requirements contract. Pepsi rejoins that the language of the Contract taken as a whole evidences sufficient writings to allow a conclusion that it is a requirements contract. "The U.C.C. does not require certain particular words to enforce a requirements contract." *Essco v. Harvard Industries,* 46 F.3d 718, 728 (8th Cir.1995); *see also, Koch Hydrocarbon Co. v. MDU Resources, Inc.,* 988 F.2d 1529, 1541 (8th Cir.1993) (the U.C.C. does not require certain "buzz words" to establish a requirements contract); *Kansas Power & Light Co. v. Burlington Northern R.R.,* 740 F.2d 780, 789 (10th Cir.1984) (no specific language necessary for a requirements contract). The court should not examine each individual provision in isolation to confirm the existence of a requirements contract. *Upsher–Smith Labs. v. Mylan Labs.,* 944 F.Supp. 1411, 1427 (D.Minn.1996). The provisions of the Contract "must be read as a unified whole, and not parsed out into individually unrelated fragments. In satisfying the Statute of Frauds, there is no invariable requirement that a writing, in confirmation of a requirements contract, must explicitly state that the buyer will buy its requirements exclusively from the seller." *Id.* Rather, "in certain instances, the promise to buy exclusively from the seller can be implied from the contract." *Zayre Corp. v. S.M. & R. Co., Inc., supra,* at 1154–55.

The Contract's language, taken as a whole, sufficiently evinces that a reasonable jury could find the Contract to be a requirements contract. The first section of the Contract states that Steak 'n Shake "may direct in writing payment of all or any part of the said funds to its former soft drink distributor in connection with Customer's transition liabilities." Plaintiff's Exhibit J. This provision indicates that Steak 'n Shake would not have multiple suppliers of soft drinks, but rather,

have Pepsi as its only supplier. The Contract also requires that Steak 'n Shake have four Pepsi products at each of its restaurants, and that Steak 'n Shake "shall have the option to add other Pepsi–Cola Company products in locations selected by [Steak 'n Shake], where available." *Id.* This provision suggests that Steak 'n Shake had the option to add only other *Pepsi* products to its soft drink offerings. Further, the Contract provides that Pepsi will use it best efforts to have its bottlers install free-of-charge fountain soft drink dispensing equipment owned by Steak 'n Shake, and also provide routine maintenance of the equipment free-of-charge. This provision further indicates that the parties intended that the contract be a requirements contract, and their writings, viewed as an integrated whole, provide written evidence that a reasonable jury could find that the Contract was a requirements contract. Accordingly, the Statute of Frauds' requirement that the Contract's quantity be in writing is satisfied.

■■■ This holding furthers the purposes of the Statute of Frauds. "The reason for the statute of frauds is quite simply to preclude fraudulent claims which would probably arise when one person's word is pitted against another's and which would open wide those ubiquitous flood-gates of litigation." *Summerlot v. Summerlot*, 408 N.E.2d 820, 828 (Ind.Ct.App.1980). Such a concern is not present here. The Contract was executed after months of negotiation against the backdrop of well-established industry customs. In addition, the parties performed under the Contract for over three years. Steak 'n Shake has now raised the Statute of Frauds defense hopefully as a method of its escaping liability for breaching the Contract. "Serious considerations ... counsel courts to be careful in construing [the Statute of Fraud's]

provisions so that undesirable rigidity does not result in injustice." *Advent Systems Ltd. v. Unisys Corp.*, 925 F.2d 670, 677 (3rd Cir. 1991). Excessive rigidity would be unjust and inconsistent with the spirit of the Uniform Commercial Code. *See id.* (the Code "shall be liberally construed and applied to promote its underlying purposes and policies").

Determining whether the Statute of Frauds has been satisfied is distinct from determining if the Contract is a "requirements contract." The Court holds that the Statute of Frauds is satisfied by virtue of the aforementioned writings contained in the Contract. *See* U.C.C. § 2–201 comment 3 (determination of whether the Statute of Frauds has been satisfied is generally a question of law). However, we do not hold that the Contract necessarily is a "requirements contract" based on these writings. The writings create an ambiguity regarding whether the Contract is a "requirements contract," the resolution of which is a question of material fact appropriately left to the trier-of-fact.[2] *See Property Owners Ins. Co. v. Hack*, 559 N.E.2d 396, 403 (Ind.Ct.App.1990); *Southern School Buildings, Inc. v. Loew Electric, Inc.*, 407 N.E.2d 240, 249 n. 6 (Ind. Ct.App.1980). Accordingly, Steak 'n Shake's motion for summary judgment to dismiss Pepsi's breach of contract claim for failing to comply with the Statute of Frauds is DENIED.

## ISSUE IV: ARE PEPSI'S REQUESTED DAMAGES LEGALLY COGNIZABLE?

■■■ Steak 'n Shake contends that Pepsi suffered no legally cognizable damages. Specifically, Steak 'n Shake contends that any potential damages from its breach are

**2.** Pepsi moves to strike portions of certain verified statements submitted by Steak 'n Shake on the issue of industry custom. The Court did not reach the issue of industry custom and thus foregoes ruling on that motion.

Steak 'n Shake's supplemental submission in support of its motion for summary judgment requests that the Court sanction Pepsi for arguing that custom in the soft drink industry is for supply contracts with restaurants to be exclusive. Steak 'n Shake contends that Pepsi's position is directly contrary to testimony given at a share-

holder's meeting by Pepsi's CEO, D. Wayne Calloway. Upon review of Mr. Calloway's statements, the Court concludes that they are not contradictory to Pepsi's position regarding industry custom. Accordingly, Steak 'n Shake's motion for sanctions is DENIED.

Pepsi's motion for permission to file supplementary evidentiary submissions in opposition to Steak 'n Shake's motion for summary judgment is GRANTED, and accordingly, were duly considered in this entry.

uncertain and speculative in nature. Damages for breach of contract may not be awarded unless there is sufficient evidence to calculate the loss with a reasonable degree of certainty. *Indiana & Mich. Elec. Co. v. Terre Haute Indus.*, 507 N.E.2d 588, 601 (Ind.Ct.App.1987); RESTATEMENT (SECOND) OF CONTRACTS § 352 (1981). However, "[t]here is no requirement of any particular degree of mathematical certainty ..., and where there is any doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer." *Babson Bros. Co. v. Tipstar Corp.*, 446 N.E.2d 11, 15 (Ind.Ct.App.1983). Further, "uncertainty of dollar amount does not prevent the award of damages." *Indiana & Mich. Elect. Co.*, 507 N.E.2d at 601. Even in difficult situations, "damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises and the like." RESTATEMENT (SECOND) OF CONTRACTS § 352, comment b (1981); *see Fowler v. Campbell*, 612 N.E.2d 596, 603 (Ind.Ct.App.1993).

Steak 'n Steak's contention that Pepsi's requested damages are speculative is based on the premise that the Contract was an alternative contract which permitted Steak 'n Shake to meet its contractual obligations through a variety of actions. Specifically, Steak 'n Shake contends that because there are so many alternatives provided for under the Contract, determining damages would necessarily be uncertain and speculative. In response, Pepsi characterizes the Contract as an exclusive requirements contract and contends that damages stemming from a breach are legally determinable and recoverable.

Assuming *arguendo* that the Contract is an alternative contract, Pepsi's breach of contract claims rest on legally cognizable damages. Steak 'n Shake maintains that it could have offered non-Pepsi brand soft drinks, increased the price of the Pepsi brand products, and no longer offered Pepsi–cola, all of which would be permitted under the Contract. Because the Contract allowed these alternatives, Steak 'n Shake argues, damages should be measured by the value of the alternative that is least burdensome or expensive to Steak 'n Shake. Steak 'n Shake contends that since there are so many potential alternatives, measuring damages would be uncertain and speculative.

Steak 'n Shake cites *Corbin on Contracts* and the *Restatement of Contracts* for the proposition that damages should be measured by the least burdensome alternative. Upon review of these highly regarded sources, it becomes clear that Steak 'n Shake's selected excerpts do not tell the whole story. Damages are assessed by that alternative which is least burdensome to Steak 'n Shake *only if* Steak 'n Shake had yet to elect one of the alternatives at the time of its breach. The *Restatement of Contracts* provides:

> The remedies for breach of an alternative contract are determined in accordance with that one of the alternatives that is chosen by the party having an election, or, in case of breach without an election, in accordance with the alternative that will result in the smallest recovery.

RESTATEMENT OF CONTRACTS, § 344. This expanded reading of the Restatement illustrates that if an election is made, damages should be measured from that election. This view is supported by *Corbin on Contracts*, which provides that "[a]fter such a choice is made and notice given, the contract ceases to be an alternative contract. Damages for breach will be measured in accordance with the alternative chosen, just as if the contract had never been in the alternative at all." 5 CORBIN ON CONTRACTS § 1079, at 458 (1st ed.1964); *See Coles v. Peck*, 96 Ind. 333 (1884). Indeed, "[t]he logical and necessary corollary of the principle that an alternative contract empowers the promisor to elect which alternative he will pursue is the conclusion that the act of election fixes the rights as between the parties." *Fidelity Fed. Sav. & Loan v. Pioneer Nat'l Title Ins. Co.*, 428 F.Supp. 1382, 1387 (S.D.Ill.1977).

Steak 'n Shake has cited *W.J. Holliday & Co. v. Highland Iron & Steel Co.*, 43 Ind. App. 342, 87 N.E. 249 (1909), for its contention that damages should be measured in accordance with the least burdensome alternative. *Holliday* is easily distinguishable from the case at bar. In *Holliday*, the de-

fendant contracted to purchase 650 tons of bar iron from the plaintiff. The contract provided that the defendant was to furnish specifications for the desired bar iron. *Id.* The defendant breached the contract before providing the requisite product specifications or accepting any shipment of the bar iron from the plaintiff. Thus, in *Holliday,* the defendant breached *before* electing an alternative either by performance or notice.

Conversely, a reasonable jury could find here that Steak 'n Shake breached the contract *after* electing to purchase all the soft drinks it required from Pepsi. A reasonable jury could find that Steak 'n Shake elected that alternative through its performance under the Contract and damages would then be calculated accordingly. *See Fidelity Fed. Sav. & Loan v. Pioneer Nat'l Title Ins. Co., supra,* at 1387 (party to alternative contract elected alternative by virtue of performing that alternative). If Steak 'n Shake had elected another alternative and then breached, the jury could assess damages according to that alternative. A reasonable approach might include calculating damages based on Steak 'n Shake's election to have Pepsi provide them with all the soft drinks they required. Steak 'n Shake does not allege that calculating such damages would require speculation or be uncertain. Indeed, while calculating Pepsi's damages would require extensive fact finding, the potential damages are ascertainable and therefore are neither speculative or uncertain.

■ "A breaching party is liable for damages which are the direct, probable, and proximate result of its breach." *Egan v. Burkhart,* 657 N.E.2d 401, 405 (Ind.Ct.App. 1995) *quoting Indiana Ins. Co. v. Plummer Power Mower and Tool Rental,* 590 N.E.2d 1085, 1092 (Ind.Ct.App.1992). The history of the parties' performance under the Contract provides a solid basis for analysis and non-speculative damage assessments. *See* RE-STATEMENT (SECOND) OF CON-TRACTS § 352 comment b (1981). A reasonable jury could find that Pepsi suffered legally cognizable damages based on Steak 'n Shake's breach of contract. Accordingly, Steak 'n Shake's motion for summary judgment seeking to dismiss Pepsi's breach of contract claim for lack of legally cognizable damages is DENIED.

Our holdings leave Pepsi's claim and Steak 'n Shake's counterclaim standing. Pepsi's motion for summary judgment on the counterclaim is DENIED because Steak 'n Shake has established a prima facie case of breach of contract and whether Pepsi violated the Contract invokes genuine issues of material fact. Steak 'n Shake's motion for summary judgment on its counterclaim is also DENIED because whether Pepsi violated the Contract turns on genuine issues of material fact. Steak 'n Shake's motion for summary judgment on Pepsi's claim, contending that the Contract violated the Statute of Frauds and that the claim lacked legally cognizable damages, is also DENIED.